WILLIAM T. BIGBEE *v.* STATE OF INDIANA.

[No. 2-275A43.  Filed June 30, 1977.]

*Paul V. Rumple, Rynearson & Rumple,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Walter F. Lockhart,* Deputy Attorney General, for appellee.

SULLIVAN, J.—Bigbee was tried by jury and was convicted of theft.[1] The trial court entered judgment on the verdict and sentenced Bigbee to imprisonment for an indeterminate period of one (1) to ten (10) years as required by IC 35-17-5-12 (Burns Code Ed. 1975). The manner in which Bigbee was charged and tried, the manner in which the jury was instructed, and the form of the verdict demonstrate that all concerned viewed the offense as one involving property of $100 or more in value, rather than the offense described in IC 35-17-5-3 (1) (f) which covers the obtaining of property by threat, without regard to value. The latter offense, if the threat is of infliction of physical harm, carries the same penalty as theft of property having value of $100 or more. *Compare* IC 35-17-5-12 (5) (g) *with* IC 35-17-5-12 (3).

Bigbee's belated appeal presents two issues for our review: (1) whether there was sufficient evidence to establish that the property, a bearer instrument, had a value of $100 dollars or more; and (2) whether there was sufficient evidence connecting Bigbee with the theft to support his conviction as an accessory.[2] We find the evidence to be sufficient in both respects and affirm the judgment.

---

1. IC 35-17-5-3 (Burns Code Ed. 1975).

2. Bigbee also asserts that the trial court erred in overruling his motion to suppress. He argues on appeal that a statement he made to Officer Okey should have been excluded because (1) it was the product of an illegal arrest and (2) the State failed to prove that Miranda warnings were given. These issues were not presented to the trial court in Bigbee's Motion to Correct Errors. The accompanying memorandum merely alleges without specificity:

"Further error is contained in the court's overruling defendant's motion to suppress defendant's statement which was taken under duress and in exchange for an unfulfilled promise to release him and admittedly a statement that covered only a portion of what defendant told Detective Sergeant Don Okey who recorded facts favorable to the State and excluded facts unfavorable to the State."

Consequently, the arguments in this respect which Bigbee asserts on appeal may be deemed waived. Rule TR. 59 (B,G); *Spivey* v. *State* (1971), 257 Ind. 257, 262-63, 274 N.E.2d 227, 230; *Sacks* v. *State* (1977), 172 Ind. App. 185, 360 N.E.2d 21, 24.

We note further that Bigbee's motion to suppress dealt only with the legality of his arrest. In this regard, the arresting officer's testimony at the suppression hearing did establish the requisite probable cause needed to make a warrantless arrest.

The trial record establishes that Bigbee's ally, McGraw, made threatening telephone calls demanding money from Mr. and Mrs. Crowder. Mrs. Crowder testified that she received the first call on the afternoon of Wednesday, August 23, 1972. The male caller threatened to take her life unless she gave him $400 dollars. Immediately thereafter, she contacted her husband at work and he notified the police. Mr. Crowder then came directly home and received all the following telephone calls. The police, having already arrived at the Crowder residence, listened on an extension phone to Mr. Crowder's subsequent conversations with the caller. On their advice, Mr. Crowder agreed to leave the designated money at a drop location specified by the caller.

Mrs. Crowder wrote and signed a check, payable to "Cash", in the amount of $400 dollars. Mr. Crowder testified that there was enough money in the bank to cover the check, but that "[he] put a hold on [the] check after it was written so that it could not be cashed".

Mrs. Crowder's check was placed in a paper sack together with shredded newspaper, "so it would look like there was a lot of money in it". With the police following in another vehicle, Mr. Crowder then drove to the designated drop location and left the sack. When some time had passed but no one had come to pick the sack up, the police retrieved it and returned to the Crowder residence to await another telephone call. The same caller as before phoned several times between 10:00 and 11:30 P.M., before he finally settled on a payment of $200 dollars to be dropped at a different location.

Mr. Crowder took the same brown paper sack containing his wife's check to the new drop site.

---

At no time during the hearing did Bigbee challenge the adequacy of the Miranda warnings. His motion to suppress was amended and evidence was introduced at the hearing to show that the statement was, for other reasons, coerced. But Bigbee made no attempt to counter Officer Okey's testimony indicating, albeit indirectly, that he advised Bigbee of his rights.

McGraw arrived soon afterwards and picked up the sack. At that point, he was apprehended by the police officer who had the location under surveillance. Following a conversation with McGraw, the police proceeded to Bigbee's home and arrested Bigbee.

According to his signed statement, Bigbee first learned of McGraw's plan to extort money at approximately 6:30-7:00 P.M. that evening. McGraw told Bigbee that he got the idea from a television show; that he had already called the "guy" and demanded money; and that he (McGraw) was going to call back.

Bigbee, driving his car, picked up two girls with whom he and McGraw drove around that evening. At one point, according to the statement, McGraw made a telephone call and then directed Bigbee to drive to the first drop location. Upon McGraw's request, Bigbee drove past the drop location several times, then let McGraw off, and waited with the car at a nearby intersection. McGraw returned and told Bigbee that he could not find the money and would have to scare the couple some more. Bigbee drove McGraw to a telephone booth and gave him a dime to make the call ("he wanted a dime to make a call, so I gave it to him, and he made the call"). McGraw wanted to look for the money one more time, so Bigbee drove him back to the drop location. McGraw still could not find the money and told Bigbee that he wanted to call the man again.

Bigbee then drove to McGraw's house where he listened on an extension while McGraw telephoned the Crowders. Since McGraw's mother would not let him leave the house, McGraw asked Bigbee to get the money for him. In the statement Bigbee describes an aborted attempt to pick up the money as follows:

"I walked by the church, and McGraw told me what kind of a car the man would be in, and this type of car was there, and a man motioned for me to come over, but I just kept walking."

Bigbee then returned directly to his own home. When Mc-Graw called and tried to get him to pick up the money, Bigbee refused. Bigbee's statement concludes:

"[McGraw] told me that he was going to sneak out, and get it for himself. The next thing I knew, the police was at my door."

I.

## THERE WAS SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT THE CHECK HAD A VALUE OF $100 OR MORE

Defendant argues that he could not have been guilty of theft of property worth $100 or more because a check is not an assignment of funds, *see* IC 26-1-3-409 (Burns Code Ed. 1974), and because a stop payment order was issued on the check. In essence, defendant disputes the sufficiency of the evidence to support the jury's finding that the check had a value of at least $100 dollars.

Contrary to the common law, our Offenses Against Property Act, IC 35-17-5-1, *et seq.* (Burns Code Ed. 1975) (hereinafter referred to as "OAPA"), permits a check to be the subject of theft.[3] However, Indiana, unlike some states, does not have a statute setting a standard by which the value of a stolen check may be measured.[4]

---

3. IC 35-17-5-13(15) (Burns Code Ed. 1975), a section defining the type of property subject to theft, states that:

(15) *"Property means anything of value. Property includes* real as well as personal property; intangibles as well as tangibles; money; *commercial instruments;* admission or transportation tickets; written instruments concerning labor, services or anything of value; written instruments otherwise of value to the owner, such as public records, deeds or wills; things growing on, affixed to, or found on or in land, or part of or affixed to any building; contract rights, *choses-in-action and other interests in or claims to wealth;* extension of credit; electricity, gas, oil and water; birds, animal and fish which ordinarily are kept in a state of confinement; food and drink." (Emphasis supplied)

4. *Cf. Whalen v. Commonwealth* (1894), 90 Va. 544, 19 S.E. 182; 50 Am.Jur.2d *Larceny,* § 46.

We hold that the amount written upon the face of a negotiable bearer instrument is competent evidence relating to its value. *See, Tillery* v. *State* (1968), 44 Ala. App. 369, 209 So.2d 432; *Felkner* v. *State* (1958), 218 Md. 300, 146 A.2d 424; *State* v. *McClellan* (1909), 82 Vt. 361, 73 A. 993; 53(A) C.J.S. *Larceny,* § 60(2); 50 Am.Jur.2d *Larceny,* § 46. *Cf. People* v. *Marques* (1974), 184 Colo. 262, 520 P.2d 113.

Our holding comports with the general rule of valuation which utilizes market value as the criterion. *Keel* v. *State* (1973), 261 Ind. 396, 304 N.E.2d 304. The rule is concerned with the amount which a willing buyer would pay to a willing seller. *See, Southern Ind. G & E Co.* v. *Gerhardt* (1961), 241 Ind. 389, 393, 172 N.E.2d 204, 205; *United States* v. *344.85 Acres of Land* (7th Cir. 1967) 384 F.2d 789, 791. With regard to checks, notes, and other commercial instruments, the concept of market value is embraced within the term, "negotiability".

The check with which we are concerned was a bearer instrument,[5] and therefore could have been negotiated[6] by McGraw to a third party notwithstanding McGraw's status as a thief. *See,* White & Summers, Handbook of the Law Under the Uniform Commercial Code 459, 494 (1972); IC 26-1-3-202 (1) (Burns Code Ed. 1974). Moreover, McGraw's status would not affect a subsequent transferee's ability to

---

5. A negotiable instrument payable to "cash" is a bearer instrument. IC 26-1-3-111 (Burns Code Ed. 1974).

6. IC 26-1-3-104(1) (Burns Code Ed. 1974), sets forth the conditions that must be met before the commercial instrument is negotiable. That subsection states as follows:

"Any writing to be a negotiable instrument within this article [chapter] must (a) be signed by the maker or drawer; and (b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this article [chapter]; and (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer."

Bigbee does not, nor could he successfully, dispute the check's negotiability. The instrument signed by Mrs. Crowder contained an unconditional promise to pay $400, was payable on demand and, because made payable to "cash", was payable to bearer.

transfer title to the instrument. *See,* White & Summers, *supra,* at 506.

Those who deal in negotiable instruments rely upon the apparent liabilities created upon the face of such instruments, and commercial affairs are conducted accordingly. White & Summers, *supra,* at 399, 456. We would be inattentive to established commercial principles if we did not acknowledge, for the purposes of the "OAPA", that the amount written upon the face of a bearer instrument may be evidence of its value.

Assuming, *arguendo,* that the lack of delivery by Mrs. Crowder to McGraw contemplated by IC 26-1-3-202(1) and IC 26-1-1-201(14) (Burns Code Ed. 1974), would have prohibited McGraw from becoming a holder, nonetheless, this fact would not have precluded him from effectively transferring title to the instrument. A bearer instrument, unlike an instrument made out to the order of a particular person, need not be indorsed by a holder before title may be transferred. *Cf.* IC 26-1-3-202(2) (Burns Code Ed. 1974). Title to a bearer instrument may be transferred when a taker simply acquires possession of the instrument. *See,* White & Summers at 458, 497. Consequently, whether McGraw was a holder is not relevant to the question of the negotiability and transferability of the check.

Nor is a check transformed into a non-negotiable instrument merely because it does not constitute an assignment of funds or because a stop payment order was issued. *Compare,* IC 26-1-3-104(1), *supra, with* IC 26-1-4-403(1) (Burns Code Ed. 1974) *and* IC 26-1-3-409 (1), *supra.*

Suffice it to say, the trier of fact may consider the check's negotiability along with all the other evidence which bears upon the question of value. We note in this respect that there was evidence regarding a stop order. The record indicates that Mrs. Crowder wrote the check, payable to

"Cash", and signed *her* name. According to Mr. Crowder's testimony, there was enough money in the bank to cover the check. Mr. Crowder also testified that he "put a hold" on the check "after it was written so that it could not be cashed".

Such evidence does not lead inexorably to the conclusion, opined by Judge White in his dissent, "that payment had been stopped—that the check could not be cashed". Mr. Crowder's testimony is inconclusive in several respects. Mrs. Crowder's signature permits a reasonable inference that she wrote the check on her account. There is no evidence showing that the Crowders had a joint account or that *Mr. Crowder* had the authority otherwise to stop payment. Moreover, the evidence does not disclose the time of afternoon or evening when Mr. Crowder requested the "hold", i.e., whether it was intended to take effect immediately or would have been delayed until the bank reopened the following day. The "hold" was requested after the check was signed. We do not know to whom the request was made nor whether it was made during banking hours.

In light of the foregoing, we find that the jury was entitled to question the effectiveness of Mr. Crowder's stop payment order. It is not our prerogative on review to draw an inference from the evidence different than that legitimately drawn by the trier of fact. Having concluded that the amount shown on the face of a bearer instrument is competent evidence with respect to its value, we likewise conclude that the jury could reasonably infer therefrom and from all the other evidence that the stolen property had a value of $100 dollars or more. *See, Felkner* v. *State, supra,* 146 A.2d at 430.

Our holding does no violence to *Burrows* v. *State* (1894), 137 Ind. 474, and its progeny.[7]

*Burrows* involved the question of value but in the context of an erroneous instruction. The defendant was convicted

7. *See, Baker* v. *State* (1928), 200 Ind. 336, 163 N.E. 268; *Roberts* v. *State* (1914), 181 Ind. 520, 104 N.E. 970.

for larceny of a check, not as here one payable to bearer, but one made out to the order of a named payee, for $50 dollars. The check was stolen before it reached the payee and it did not bear his endorsement. It was therefore not negotiable.

The trial court's instructions to the jury stated that a check was "presumptively of some value" if, when it was drawn, the drawer had sufficient funds in the bank on which it was drawn to cover the check. On appeal, the Supreme Court reversed for the following reasons:

> ". . . in the giving of the instruction . . . , the court usurped the functions of the jury and took away from them the question of value, which it was their province alone to determine." 137 Ind. at 477, 37 N.E. at 272.

The Court concluded by saying:

> ". . . it becomes a material question whether the check in controversy, payable to order, out of the possession of the payee, and without his indorsement thereon, was of any value. The instruction in review, in effect, told the jury to ignore the testimony of the witnesses as to value, . . . , that a value was to be presumed." 137 Ind. at 478, 37 N.E. at 272.

*Burrows* says it is improper for the trial court to instruct the jury that a fact in issue (i.e., value) may be presumed. The case at bar involves an entirely different problem. The jury's finding of value is being challenged on appeal for lack of sufficient evidence. Under the applicable standard of review, we must affirm if there is *any* probative evidence to support the trier of fact's finding.

In affirming, we are not encroaching upon the function of the trier of fact. To the contrary, our holding honors the jury's finding of value and thereby emphasizes that it is the exclusive prerogative of the jury to determine such material issues of fact.

## II.

### EVIDENCE OF BIGBEE'S PARTICIPATION IN CRIME SUFFICIENT TO SUPPORT CONVICTION

Bigbee asserts that the evidence is insufficient to support his conviction as an accessory under IC 35-1-29-1 (Burns Code Ed. 1975).[8]

Two of his arguments in this regard are plainly without merit and may be disposed of in summary fashion. One is his suggestion that the State must prove a preconceived plan. We note in this respect that our accessory statute does not require proof of a preconceived scheme or plan. Mere concerted action or participation in the illegal act is sufficient. *Simmons v. State* (1974), 262 Ind. 300, 315 N.E.2d 368.

Nor do we find any merit in Bigbee's assertion that his conviction must fail because there was no evidence of his participation (1) at the time the first threatening telephone call was made and (2) when McGraw later went to the second drop location to pick up the payment. Although an accessory must aid the principal in the commission of the crime, the evidence need not show that he personally participated in the commission of each element of the felony. *Coleman v. State* (1976), 265 Ind. 357, 354 N.E.2d 232; *Dozier v. State* (1976), 264 Ind. 329, 343 N.E.2d 783, 785; *Pruitt v. State* (1975), 166 Ind. App. 67, 333 N.E.2d 874, 880.

We turn now to the crux of Bigbee's argument, namely, his contention that the evidence only shows conduct on his part amounting to negative acquiescence.

We agree that mere negative acquiescence is insufficient to support an accessory conviction and that there must be

---

8. Conviction of a person as an accessory requires proof that the underlying crime was committed. *Rufer v. State* (1976), 264 Ind. 258, 342 N.E.2d 856; *Combs v. State* (1973), 260 Ind. 294, 295 N.E.2d 366. No contention is made here that McGraw did not commit the crime.

some course of conduct of an affirmative nature connecting the defendant with the crime (unless the person who fails to oppose the crime owes a duty to protect). *See, Pace v. State* (1967), 248 Ind. 146, 224 N.E.2d 312. However, defendant's presence at the scene of the crime, while alone not enough, may be considered with other evidence in determining guilt. Our cases have held that the trier of fact may infer participation from defendant's failure to oppose the crime, companionship with one engaged therein, and a course of conduct before and after the offense. *Simmons v. State, supra; Pace v. State, supra; Cotton v. State* (1965), 247 Ind. 56, 61-62, 211 N.E.2d 158. As indicated in *Pace, supra,* each case must be considered on its own facts.

In reviewing the record, we find ample evidence of affirmative conduct by Bigbee in connection with the crime: (1) Bigbee had knowledge that the crime was in progress but did nothing to oppose it; (2) with such knowledge and upon McGraw's request, Bigbee drove McGraw to the drop location several times and to telephones which McGraw used to make threatening calls; (3) Bigbee also furnished McGraw the money to make one of the calls; (4) on one occasion Bigbee listened in on McGraw's telephone conversation with Mr. Crowder; (5) and finally, Bigbee himself made an attempt, albeit an aborted one, to pick up the payment. Such evidence clearly demonstrates conduct beyond mere negative acquiescence and is sufficient to support the inference that Bigbee aided and encouraged McGraw in committing the crime.

The judgment is affirmed.

Hoffman, J. (participating by designation), concurs; White, J., dissents with separate opinion.

DISSENTING OPINION

WHITE, J.—The court's opinion asserts that its holding does no violence to *Burrows* v. *State* (1894), 137 Ind. 474, 37 N.E. 271, and its progeny, including *Baker* v. *State* (1928), 200 Ind. 336, 163 N.E. 268. I believe it does. I would reverse.

The facts in *Burrows* are scattered throughout the opinion and much of the evidence seems to have been omitted. However, it appears there was *prima facie* proof that R. L. Piser wrote a check in the State of New York on a New York bank payable to the order of Arthur LeRoy Piser in the sum of Fifty Dollars and mailed it to the payee in Crawfordsville, Indiana, where Burrows apparently stole it before it reached the payee. Burrows' conviction of larceny was reversed because the court gave an instruction stating: " 'A check drawn on a bank, when the drawer has money on deposit, as much or more than sufficient to pay the check, is presumptively of some value in the hands of the person in whose favor it is drawn.' " (137 Ind. at 475.)

What the *Burrows* evidence, if any, was with respect to the value of the check, the opinion does not state. However, the court noted that "the bank on which the check was made payable, being located in the State of New York, the maker could have availed himself of the right to order the bank not to pay it, or withdrawn the money on deposit before it could have been presented for payment." (Ibid. at 477.) Also:

> "On the trial of the cause it became a material question whether the check in controversy, payable to order, out of the possession of the payee, and without his endorsement thereon, was of any value. The instruction in review, in effect, told the jury to ignore the testimony of the witnesses as to value, for the reason already indicated, that a value was to be presumed." (Ibid. at 478.)

Of course, the *Burrows* court did not say whether there was sufficient evidence of value to have sustained the verdict of guilty had the trial court not given the erroneous instruction, but the implication is clear that because the check's

maker could have stopped payment the jury could have found the check to be worthless. At bar, however, the undisputed evidence is that payment had been stopped—that the check could not be cashed. If it was not proper for the *Burrows* jury to presume that the check in that case had "some value", regardless of the evidence, it was equally improper for the jury in this case to find on no evidence except the sum written on the check that it had a value of more than $100.00.

In *Baker* v. *State* (1928), *supra,* 200 Ind. 336, 163 N.E. 268, a petit larceny conviction for the theft of six chickens was reversed for failure to prove ownership and, on authority of *Burrows,* for failure to prove that the six chickens had any value. I agree with Judge Martin who wrote the court's opinion but would have preferred to adopt the rule that "the jury may infer value *where the nature of the property* is such as to justify such an inference." (200 Ind. at 337.) (Our emphasis.) I believe that in most instances of theft of *tangible* property it would be reasonable for the trier of fact to infer some value merely from the nature of the property, especially if the property is exhibited in evidence. But intangible property is not susceptible of reliable evaluation on mere inspection since it has no inherent value. It is but a token which signifies that it may be exchanged for something of value if it is in fact what it purports to be. But a check on which payment has been stopped is not what it purports to be. And when that fact is in evidence, and uncontradicted, how can the trier of fact find the check to have a value of $100.00 or more, merely because on its face it purports to be negotiable for $400.00? How, in fact, can it be found to have any value?

To return to *Burrows, supra,* 137 Ind. at 476, the court also said:

> "The enactment of laws in Iowa and Missouri, fixing *prima facie* the value of these choses in action, is a controlling argument in favor of the necessity of such a law, and equally as potent a reason, in the absence of it, that the value of this class of instruments is a question alone

for the consideration of the jury trying the cause. Courts can not, during the progress of a trial, supply by instruction what they may deem to be necessary legislative enactments."

As the court's opinion at bar acknowledges, Indiana does not yet have a statute setting a standard by which the value of a stolen check may be measured. Nevertheless the majority holds that the amount written on the face of a bearer instrument is evidence of its value because it would be "inattentive to established commercial principles" not to do so.[1] Thus by judicial fiat the court supplies the missing statute, disregarding the quoted *Burrows* statement that "courts can not . . . supply . . . what they deem to be necessary legislative enactments."

Had the prosecutor charged the defendant under the appropriate statute it would have been unnecessary to ascribe a questionable value to the check in order to send him to prison for one to ten years. Ind. Ann. Stat. § 35-17-5-14 (Burns Code Ed., 1975) provides that "a person commits a crime when he knowingly demands by threat control over property of the owner . . . or threatens a person with intent thereby to obtain or exert control over property of the owner. . . ." The penalty is the same as that for theft of $100 or more. Appellant committed the crime proscribed by § 35-17-5-14 when he aided his accomplice in attempting to collect the sum his accomplice had demanded of Mrs. Crowder on threat of death. To prove that crime, had it been charged, it would have been unnecessary to prove that appellant or his accomplice obtained anything of value.

The prosecutor's failure to bring the proper charge should not cast upon us the burden of saving his case by presuming a

---

1. The court's opinion gives the impression that it is a matter of common knowledge of which we may take judicial notice that "[t]hose who deal in negotiable instruments rely upon the apparent liabilities created upon the face of such instruments". Many people who have unsuccessfully tried to obtain money or merchandise with checks in establishments where they are not known and cannot produce satisfactory proof of the check's value may have a different idea.

fictitious value for the bundle of scrap paper used to catch the would-be extortionists. A similar mistake was made by the prosecutor in *Craft* v. *State* (1964), 246 Ind. 49, 202 N.E.2d 570, a prosecution for vehicle taking under a vehicle taking statute (Ind. Acts 1927, Ch. 201, § 4), which required proof that the vehicle had a value of $50.00 or more, even though there was another vehicle taking statute (Ind. Acts 1941, Ch. 148, § 8) which required no proof of value. Failure to prove value in that case resulted in reversal, as it should in this case.

I would reverse and remand with instructions to discharge appellant.

NOTE.—Reported at 364 N.E.2d 149.

