Cheal R. BALLS, Appellant–Defendant,

v.

STATE of Indiana, Appellee.

No. 49A04–9908–CR–374.

Court of Appeals of Indiana.

March 15, 2000.

Rehearing Denied May 3, 2000.

Andrew C. Krull, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, James B. Martin, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge

Appellant, Cheal R. Balls (Balls), appeals his convictions for Welfare Fraud,[1] a Class C felony, and Theft,[2] a Class D felony.

We affirm, subject to vacation of the theft conviction.

Upon appeal, Balls presents three issues for our review, which we restate as follows:

(1) Whether the welfare fraud statute is unconstitutionally vague as applied to Balls;

(2) Whether the welfare fraud statute provides for a disproportionate sentence; and

(3) Whether the trial court erred in ordering Balls to pay $8,000 in restitution.

We also raise one issue *sua sponte:* whether merger of the theft and welfare convictions is adequate.

The facts most favorable to the judgment reveal that on May 6, 1998, at approximately 8:55 a.m., Joan Whited (Whited), took a break from her job of issuing food stamps[3] at the Marion County Office of Family and Children Food Stamp Issuance Division (MCOFC). When she took her break, she left an unopened box containing $8,000[4] worth of food stamps unattended in her work area. Shortly after she returned,[5] she noticed that the box of food stamps was missing. Whited reported the missing box of food stamps to her supervisor, Bonnie Thompson (Thompson). At that point, Thompson shut down the office and looked through each employee's desk and their personal belongings. She also called her supervisor, Larry Miller (Miller), so that he could verify that the missing box of food stamps was not in her office. The missing box of food stamps

---

1. I.C. 35–43–5–7 (Burns Code Ed. Repl.1998).

2. I.C. 35–43–4–2 (Burns Code Ed. Repl.1998).

3. Cashiers, such as Whited, issue food stamps. Persons eligible for food stamps come to a window and are asked to show their identification card. By typing in the PIN number on the identification card, cashiers are able to determine what allotment of food stamps is still available. If there are food stamps available, the cashier will give the person a printout to sign showing the denomination of food stamps given. The person signs the sheet and the cashier checks to make sure that the signature matches the one on the identification card. Then, the appropriate amount of food stamps is issued.

4. On May 6, 1998, a sealed box of stamps was logged out to Whited. The food stamps in the sealed box had not yet been counted, but according to the serial numbers, the box contained two hundred booklets, with each booklet containing forty dollars worth of food stamps.

5. Whited took her break from 8:55 a.m. to 9:10 a.m.

was not found anywhere in the food-stamp office.

Thompson notified Jim Rugin, head of the local office of the United States Department of Agriculture (USDA), so that the numbers on the missing food stamps could be reported to retailers.

On that same day, at approximately 9:00 a.m., Balls was in the food stamp office to pick up surplus equipment. The food stamp work area is secured such that people without a key to the area are only allowed in and out with an escort. Miller accompanied Balls to the food stamp area. However, he left Balls alone for approximately ten minutes in the area where cashiers distribute food stamps. Upon Miller's return to the area, he and Balls loaded the surplus equipment and left the food stamp area.

On May 6, 1998, around noon, Balls went to the residence of Katherine Haney McFarland (McFarland). Balls gave McFarland some food stamps.[6] McFarland gave $200 worth of those food stamps to her neighbor, Dana Ellis (Ellis). Three or four days later, Balls gave McFarland more food stamps. She sold some and used the rest.

On May 14, 1998, food stamps with serial numbers matching some of those among the missing stamps were discovered at an Indianapolis Cub Foods Store. The food stamps were traced to Ellis. Ellis informed investigators that McFarland had given her the stolen food stamps. McFarland testified that Balls gave her the food stamps that she gave to Ellis.

After a bench trial, Balls was convicted of both theft and welfare fraud. The trial court ordered Balls to pay restitution to the MCOFC in the amount of $8,000. The theft conviction was "merged" into the welfare fraud conviction, and Balls was sentenced to six years in Community Corrections.

*I. Application of Welfare Fraud Statute*

Balls contends that the welfare fraud statute is unconstitutionally vague as applied to him in this case. Specifically, he argues that interpreting the welfare fraud statute to include stealing a box of food stamps, when presented with a random opportunity to do so, is improper because fraud contemplates some sort of misrepresentation along with a degree of planning or premeditation, which he maintains are not present in this case. He asserts that by using the word "fraud" to define the crime, the Legislature included certain unenumerated elements in addition to those actually set forth. Balls claims that if he is guilty of anything it is theft, but not welfare fraud.

IND.CODE 35–43–5–7 provides that "[a] person who knowingly or intentionally . . . [a]cquires, possesses, uses, transfers, sells, trades, issues, or disposes of . . . [p]ublic relief or assistance; except as authorized by law . . . commits welfare fraud. . . ." Here, it is apparent that Balls acquired, possessed, and transferred or disposed of public relief or assistance by stealing a box of food stamps from the MCOFC and giving some of the food stamps to McFarland, thus committing welfare fraud.

Regardless of the label placed upon the crime by the legislature, it is clear that the welfare fraud statute was intended to punish, as a crime separate and distinct from that punished under the general theft statute, stealing or otherwise dealing with food stamps and other forms of public assistance unless authorized by law to do so. We decline Balls' invitation to write additional elements into the welfare fraud statute or, in the alternative, to declare the statute unconstitutionally vague.

*II. Proportionality of Sentence*

Balls claims that the welfare fraud statute provides for a disproportionate sentence in comparison to the theft statute. In support of his argument, he notes that

---

**6.** McFarland testified that Balls gave her approximately ten books of food stamps, which each contained forty dollars worth of five-dollar food stamps.

the theft of property valuing $8,000 is a Class D felony,[7] whereas welfare fraud involving theft of public assistance in the amount of $8,000 is a Class C felony.[8]

■ Article 1, Section 16, of the Indiana Constitution requires that "[a]ll penalties shall be proportioned to the nature of the offense." Indiana courts have consistently maintained that " '[t]he nature and extent of penal sanctions are primarily legislative considerations....' " *State v. Moss–Dwyer* (1997) Ind., 686 N.E.2d 109, 111 (quoting *Person v. State* (1996) Ind. App., 661 N.E.2d 587, 593, *trans. denied* ). Our review of a legislatively sanctioned penalty is very deferential, and we will not disturb the Legislature's determination except upon a showing of clear constitutional infirmity. *Moss–Dwyer, supra* at 111–12.

■ Because the Legislature is at liberty to punish more severely theft of public assistance than theft of other kinds of property or currency, the increase of one increment in felony classification for the theft of public assistance such as food stamps as compared to theft of other property or currency does not render Balls' sentence disproportionate to the crime he committed or disproportionate to punishment under the theft statute.

### III.   Restitution

■ Balls asserts that if he is guilty only of theft, the restitution order of $8,000 or the return of $8,000 in food stamps would be proper. In the alternative, he argues that if the welfare fraud conviction stands, the case should be remanded to determine the actual loss sustained by the victim, the MCOFC. The State contends that Balls' distinction between theft and fraud is irrelevant to the determination of restitution and that the trial court properly determined the amount of restitution to be $8,000, the face

amount of the stolen food stamps. We agree with the State.

IND.CODE 35–50–5–3(a) (Burns Code Ed. Repl.1998) provides that:

"in addition to any sentence imposed under this article for a felony or misdemeanor, the court may, as a condition of probation or without placing the person on probation, order the person to make restitution to the victim of the crime ... The court shall base its restitution order upon a consideration of:

(1) property damages of the victim incurred as a result of the crime, based on the actual cost of repair (or replacement if repair is inappropriate);

(2) medical and hospital costs incurred by the victim ...;

(3) earnings lost by the victim ...; and

(4) funeral, burial, or cremation costs incurred by the family or estate of a homicide victim as a result of the crime."

I.C. 35–50–5–3 clearly reflects a legislative intent that in addition to a sentence, a person convicted of a felony or misdemeanor may be ordered to make restitution to the victim [9] for losses sustained as the result of the criminal conduct. *See* I.C. 35–50–5–3(a); I.C. 35–50–5–3(i) (stating that the court may order a person convicted of an offense involving conversion or misappropriation of title insurance escrow funds under I.C. 35–43–9 to make restitution to the victim of a crime based upon a consideration of the amount of money which the convicted person converted, misappropriated, received, or with regard to which a conspiracy existed). In this case, Balls' commission of welfare fraud by stealing $8,000 worth of food stamps, a Class C felony, falls within I.C. 35–50–5–3 and thus allows the trial court

---

**7.** *See* I.C. 35–43–4–2(a).

**8.** *See* I.C. 35–43–5–7(b)(2).

**9.** A state entity, such as the MCOFC, may be a "victim" under the restitution statute. *See Hendrickson v. State* (1998) Ind.App., 690 N.E.2d 765, 768.

to order restitution in addition to Balls' sentence. The issue then becomes what amount of restitution is proper.

Balls implies that his restitution should be limited to the actual loss sustained by the MCOFC or the cost of reprinting the food stamps, not the face amount of the stolen food stamps. IND.CODE 35–50–5–3 lists considerations upon which a trial court shall base its restitution order, but theft of food stamps does not readily lend itself to the terminology used in the statute. The category in the statute most similar to this situation is restitution for property damages of the victim based upon the actual cost of repair or replacement. However, stolen food stamps are not readily replaced.

Replacement of the missing food stamps would require the government to print new food stamps. Reprinting the food stamps would probably involve minimal cost. Nevertheless, the old, missing food stamps are still unaccounted for and could presumably be sold or used. Further, it does not comport with logic, reason, or common sense to say that restitution in this case is confined to the minimal cost of printing new food stamps. Thus, we must determine the appropriate value to place on the food stamps for purposes of restitution.

In determining an appropriate amount of restitution for the stolen food stamps, we analogize the food stamps to money or bearer paper. Food stamps are like money in that they have a stated value on their face and can be used to buy food worth that amount. In ordering restitution for stealing $8,000 in cash, the restitution ordered would be the money stolen or $8,000.

Food stamps are also like bearer paper. An example of bearer paper is an $8,000 check payable to "cash" and signed by the drawer. Bearer paper is negotiable by the holder of the instrument for the amount upon the face of the instrument. Likewise, food stamps are negotiable by the person who holds the food stamps by giving them the ability to exchange the food stamps for food. Both bearer paper and food stamps have an amount on their face. Moreover, we have held that "the amount written upon the face of a negotiable bearer instrument is competent evidence relating to its value." *Bigbee v. State* (1977) 173 Ind.App. 462, 467, 364 N.E.2d 149, 153, *trans. denied.*

Unlike a blank check, which has no value until it is filled out, the food stamps had pre-printed amounts on their face. When Balls took the food stamps, he took something worth $8,000 to him because he could attempt to redeem them for $8,000 in food or sell them for a profit.

We find that the amount printed on the face of the food stamps is competent evidence relating to their value. The total face value of the stolen food stamps was $8,000. Therefore, the trial court did not err by ordering Balls to pay $8,000 in restitution to the MCOFC.

### IV. Theft and Welfare Fraud Convictions

◼ The trial court found Balls guilty of both welfare fraud and theft. It "merged" Balls' conviction for theft into his welfare fraud conviction. While Balls was only sentenced for welfare fraud, the theft conviction was not vacated.

"Merger" is inadequate. The "merged" offense must be vacated. *See Cohen v. State* (1999) Ind.App., 714 N.E.2d 1168, *trans. denied; Redman v. State* (1997) Ind.App., 679 N.E.2d 927, *trans. denied.*

The judgment is affirmed with respect to the welfare fraud conviction and the restitution order, but the matter is remanded to the trial court with instructions to vacate the theft conviction.

STATON, J., and BAKER, J., concur.