**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Martin R. KUCIK, Defendant–Appellant.**

**No. 87–2305.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 16, 1988.

Decided April 21, 1988.

James F. Young, Chicago, Ill., for defendant-appellant.

Joel D. Bertocchi, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before POSNER, EASTERBROOK and MANION, Circuit Judges.

POSNER, Circuit Judge.

Martin Kucik appeals from his conviction on four counts of having stolen, on four separate days in April 1982, a series of cashier's checks from a bank, in violation of 18 U.S.C. § 2113(b). This statute makes it a felony punishable by up to ten years in prison and a $5,000 fine to "tak[e] and carr[y] away, with intent to steal or purloin, any property or money or any other thing of value exceeding $100 belonging to, or in the care, custody, control, manage-

ment, or possession" of a federally chartered or insured financial institution. Count I, which is typical of all four counts, charges that on or about April 14 Kucik "did knowingly take and carry away, with intent to steal and purloin, from the State Bank of Countryside [which is federally insured] ... cashiers checks totalling approximately $115,000 belonging to ... the bank." The four series of checks amounted in total to $581,000.

Kucik was a check kiter. He had two accounts, one in the State Bank of Countryside and one in the credit union of a local trade union. At both institutions he ingratiated himself with the staff by small presents and big talk, convincing the staff that he was a successful businessman who needed large quantities of cash for a golf club business that he owned. He bought cashier's checks from the bank and paid for them with checks drawn on his account—which had insufficient funds—at the credit union. Before the bank demanded payment by the credit union, Kucik would deposit the cashier's checks in his credit-union account, thereby covering the checks he had drawn on that account to buy the cashier's checks. Then he would go back to the bank and buy additional cashier's checks and deposit them in the credit union to cover the latest purchase.

If this were all there had been to the scheme, money would have circulated at a dizzying rate between the two accounts but the only gain to Kucik would have been interest on his account in the credit union, and the only loss to the bank and the credit union would have been the time value of the money when it was circulating or when it was deposited in Kucik's account drawing interest. But as is usual in a check-kiting scheme, there was more. Some of the checks that Kucik drew on his credit-union account when temporarily swollen with the cashier's checks did not go to buy more cashier's checks but apparently were cashed by Kucik. The record is murky on how much the credit union lost, but it may have been in excess of $250,000. The bank, however, lost nothing, at least so far as the record reveals. The credit union honored the checks that Kucik used to purchase the cashier's checks involved in the first two counts of the indictment, when the bank presented the credit union's checks for payment, but apparently the credit union was able to recoup the money paid on these checks from Kucik; so, as to these checks, neither institution was hurt. The bank stopped payment on the cashier's checks involved in the last two counts; and since no one who, notwithstanding the stop-payment order, might have demanded payment (i.e., a holder in due course) did so, the bank lost nothing on those checks either.

The United States Attorney could not have charged Kucik with theft from the credit union, because the credit union was not federally chartered or insured. Since the credit union was the only victim of Kucik's check-kiting scheme, one might have supposed that the state rather than the federal authorities would have prosecuted him. However, for reasons not revealed to us, the U.S. Attorney was determined to act in the matter, and he therefore cast the indictment in terms of a theft not of the bank's money—for the bank lost no money through its dealings with Kucik—but of its cashier's checks. Section 2113(b) has been interpreted to punish, among other forms of theft, theft by false pretenses. *Bell v. United States*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). The false pretenses in this case are said to be Kucik's misrepresentations that he had enough money in his credit-union account to pay for the cashier's checks. The jury agreed, and convicted Kucik, and the judge sentenced him to three years in prison on Count I to be followed by concurrent terms of probation on the other three counts.

If Kucik had been charged with stealing the bank's money, he would have to be acquitted on all four counts, because he did not succeed in taking any of the bank's money. Begin with the transactions that are the subject of Counts I and II. Kucik bought and paid for the cashier's checks involved in those counts. It is true both that the bank would not have done business with him if it had known he was going to pay for the checks by kiting, and that he made misrepresentations to bank personnel

intended to prevent the bank from catching on to his check-kiting scheme. Nevertheless, the checks were paid for in full, just as if the entire transaction had been on the up and up. This was an attempt—if it was anything. At common law, it could well have been nothing. So far as we can tell from the record, Kucik had no intention of cashing any of the cashier's checks (i.e., of taking the bank's money), or indeed of using them for any purpose other than to obtain checks from the credit union, some of which he cashed—but not any of the checks involved in Counts I and II. True, the bank's funds were placed at risk, because the credit union might dishonor Kucik's checks drawn on the credit union for the purchase of cashier's checks. How great the risk was, and whether placing a bank's funds at risk in this way and to this degree could make Kucik guilty of an attempt to steal those funds even if he intended to pay the bank from his account in the credit union (but that account was funded by his cashier's checks!), are difficult questions but not ones we have to answer. Nor need we decide whether the attempt offense in 18 U.S.C. § 2113(a), which punishes entering a bank with intent to commit a felony, including the felony of bank theft by false pretenses, see *United States v. Goudy*, 792 F.2d 664, 671 (7th Cir.1986); *United States v. Clark*, 776 F.2d 623, 626 (7th Cir.1984), differs from common law attempt and if so might encompass Kucik's conduct even if the common law concept of attempt does not. Kucik was not charged with attempt.

With regard to the third and fourth counts, Kucik did succeed in obtaining cashier's checks with worthless checks drawn on his by-then thoroughly insolvent account with the credit union. But the bank stopped payment on these cashier's checks, was never called on to pay them, and lost nothing (not even float, so far as appears) as a result of the transaction.

We could stop here if the indictment had charged Kucik with taking and carrying away the bank's money, but it did not; it charged him with taking and carrying away cashier's checks. Cf. *Carrillo v. State*, 566 S.W.2d 902, 906–07 (Tex.Crim.

App.1978). So we must decide whether a cashier's check is a "thing of value" within the meaning of section 2113(b) even if the bank either is paid in full for the check (Counts I and II) or never has to make good on the check (Counts III and IV) because it is never presented for payment. The government has cited no case on the question to us, though we have found statements in two cases, *Bennett v. United States*, 399 F.2d 740, 744 (9th Cir.1968), and *Lubin v. United States*, 313 F.2d 419, 421 (9th Cir.1963), that cashier's checks are things of value within the meaning of section 2113(b), and holdings to this effect in two other cases, arising under state theft statutes, *Hucal v. People*, 176 Colo. 529, 534, 493 P.2d 23, 26 (1971), and *People v. Britz*, 17 Cal.App.3d 743, 752–54, 95 Cal. Rptr. 303, 308–09 (1971).

The government asks us to equate cashier's checks to cash, and thus to treat the case as if Kucik had stolen cash and been stopped before he could spend it. As soon as he had the cash in his possession the "asportation" required for theft would have occurred ("taking and carrying" in the language of section 2113(b)), and it would be immaterial that the bank had not been hurt by the momentary deprivation of control over the cash. Cf. *Hucal v. People, supra*, 176 Colo. at 534, 493 P.2d at 26. An even easier case would be one where the cash was not recovered but the bank was fully insured. The theft would be complete when the cash was taken; the fact that the bank had a contract with an insurance company enabling it to shift the loss to that company would be immaterial.

Here, however, the bank lost nothing, not even for a second. A cashier's check is not legal tender, nor a good with intrinsic value such as an ash tray, a sofa, or a bird bath, but merely a promise to pay—and what could it mean to steal a promise? In the case of the checks involved in Counts III and IV, the promise was (properly) dishonored: the bank stopped payment, and was never out of pocket. In the case of the checks involved in the first two counts the bank paid the credit union—to which Kucik had endorsed the checks for deposit

—but, so far as appears, the bank paid only *after* it had been credited by the credit union in the amount of the checks. In any event, the bank was repaid in full.

The government does not argue that an ordinary check—not certified, not a cashier's check, and not a bank check (which is a check drawn by one bank on another)—is a thing of value *to the bank*. How could it be, when a bank is not contractually obligated to honor a check until it accepts it? See UCC § 3–409; White & Summers, Handbook on the Law Under the Uniform Commercial Code 681 (2d ed. 1980). A cashier's check is completely different, from the bank's standpoint, because it obligates the bank to pay a holder in due course, as an ordinary check does not. *Id.* at 680–81; *Santos v. First National State Bank,* 186 N.J.Super. 52, 451 A.2d 401 (1982); *Pennsylvania v. Curtiss National Bank,* 427 F.2d 395, 399 (5th Cir.1970); *Ross v. Peck Iron & Metal Co.,* 264 F.2d 262, 269 (4th Cir.1959); *National Newark & Essex Bank v. Giordano,* 111 N.J.Super. 347, 268 A.2d 327 (1970); cf. *Munson v. American National Bank & Trust Co.,* 484 F.2d 620, 623–24 (7th Cir.1973); Brady on Bank Checks ¶ 1.17 (Bailey ed., 6th ed. 1987). So if Kucik had negotiated the cashier's checks to a person meeting the requirements of a holder in due course, the bank would have had to make good on its promise to pay and would have been out of pocket if the credit union had refused to honor its checks drawn to pay for the cashier's checks. But that didn't happen, so the promise turned out to be costless to the bank. Although the checks may have had some slight value as printed forms, not only was the bank (so far as appears) fully compensated in the $1 fee that it charged for issuing each cashier's check but the value of the checks as printed forms could not have been great enough to support a felony charge, which under section 2113(b) requires a taking of at least $100.

The following example may help fix the distinction between cash and a cashier's check. Suppose A knowingly tenders $100 in counterfeit currency to a bank and receives in exchange $100 in cash. B tenders the same amount of counterfeit currency but receives in exchange a cashier's check for $100, for which he pays the bank its usual $1. A loses the cash and shortly afterward it is found and returned to the bank. B uses the cashier's check to buy a radio from a merchant and the merchant loses the check and it is therefore never submitted to the bank for payment. In both cases the bank spots the counterfeit currency and turns it in to the authorities. A, having lost the cash, does not benefit from his theft, but the bank is out $100 until the money is returned. B benefits (he gets the radio) but the bank is out nothing —it is in the same position it would have been in if the transaction had been straight, that is, $1 to the good. That is this case.

At argument we asked counsel for the government whether it would have been robbery or attempted robbery if Kucik had ordered a bank teller at the point of a gun to make an electronic funds transfer to Kucik's account at the credit union and the transfer had somehow not gone through; counsel properly acknowledged that it would have been attempted robbery. He also acknowledged that what actually happened in this case was the same thing—attempted theft.

Despite the government's incautious concessions and incomplete research, we have concluded that Kucik did take something of value from the bank (whether by means of false pretenses is a separate question, which we get to next). A cashier's check is an unequivocal, irrevocable promise by a bank to pay the face amount of the check to any holder in due course; the cases we cited earlier call it a bank's "bill of exchange." Until modern times bank bills of exchange made out to bearer (bank notes) were a principal form of currency in England and America. See, e.g., Friedman & Schwartz, A Monetary History of the United States 1867–1960, at 17–23 (1963); Moore & Russell, Money: Its Origin, Development and Modern Use 36–37, 140 (1987); Hepburn, A History of Currency in the United States, chs. 7–9 (1915). The main practical difference between cash and cashier's checks (or certified checks or

bank checks—they are all bank bills of exchange) is that cash is backed up by the full faith and credit of the United States, and cashier's checks are not. But such is the confidence in bank solvency that cashier's checks circulate freely and are considered money substitutes. See, e.g., *Crunk v. State Farm Fire & Casualty Co.*, 106 Wash.2d 23, 719 P.2d 1338 (1986); *Santos v. First National State Bank, supra*, 186 N.J.Super. at 62, 66, 451 A.2d at 406, 410; *Gillespie v. Riley Mgmt. Corp.*, 59 Ill.2d 211, 319 N.E.2d 753 (1974); Lawrence, *Making Cashier's Checks and Other Bank Checks Cost-Effective: A Plea for Revision of Articles 3 and 4 of the Uniform Commercial Code*, 64 Minn.L. Rev. 275, 289 (1980); cf. *Bank of the United States v. Bank of Georgia*, 23 U.S. (10 Wheat.) 333, 342–43, 6 L.Ed. 334 (1825); 2 Daniel, A Treatise on the Law of Negotiable Instruments § 1672 (Calvert ed., 6th ed. 1913). It would be unrealistic to conclude that they are not things of value.

It may seem that if cashier's checks are things of value, so are ordinary personal checks; and that is true, though not relevant to a case of bank theft. The theft of a personal check is a theft from the drawer or the bearer. *People v. Carter*, 394 Ill. 403, 68 N.E.2d 737 (1946). The amount of the theft is, prima facie, the face amount of the check, and the prima facie case of theft is not rebutted by showing that payment was stopped on the check; it is enough if the check could have been negotiated (thus excluding the case where the theft is merely of check forms). See, e.g., *People v. Marques*, 184 Colo. 262, 268–69, 520 P.2d 113, 116–17 (1974); *State v. Easton*, 69 Wash.2d 965, 970–71, 422 P.2d 7, 10–11 (1966); *Felkner v. State*, 218 Md. 300, 146 A.2d 424 (1958); *Bigbee v. State*, 173 Ind.App. 462, 364 N.E.2d 149 (1977). It is not theft from the bank on which the check is drawn, because (unless the check is certified) the bank has no legal obligation to pay it, cf. *United States v. Blackmon*, 839 F.2d 900, 904–06 (2d Cir. 1988), whereas the bank does have a legal obligation to pay a cashier's check to a holder in due course. But our only purpose in citing cases involving ordinary checks is to show how plain it is that a cashier's check is a thing of value for purposes of the law of theft.

And while the bank suffered no loss in this case, that is often true in cases of theft. If the stolen property is returned promptly there may be no loss (imagine that cash were stolen from the bank's vault at midnight and recovered at 1:00 a.m.). See, e.g., *United States v. Dial*, 757 F.2d 163, 170 (7th Cir.1985), and cases cited there. Proof of loss is important in a civil case but usually is not required in a criminal case. It would thus be cutting things too fine to distinguish between thefts of cash and thefts of cashier's checks.

But theft does require an intent to deprive the owner or possessor of his property permanently. This requirement would pose a serious, perhaps fatal, problem if Kucik had been accused of stealing the bank's money, because so far as appears Kucik had no intention of depriving the bank of that money permanently; he may have expected and desired that the bank would be completely repaid from checks drawn on his account at the credit union, just as in the case of a bona fide purchase of cashier's checks. The issue may be different when the focus shifts from the money to the checks themselves, viewed as things of value apart from the money that is backing them. Kucik did not borrow the checks, intending to return them to the bank (as by endorsement over to the bank). He intended to keep them and use them to refurbish his account in the credit union. Maybe that is all the intent required for a theft of cashier's checks—but maybe not. The law is unclear on whether it is theft to take a person's property without his consent, intending to pay him in full. See 2 LaFave & Scott, Substantive Criminal Law § 8.5, at pp. 362–63 (1986). One could argue from first principles that since a primary purpose of punishing common law crimes such as theft is to prevent people from bypassing the market, such conduct is theft. But this we need not resolve, since Kucik does not argue that the government failed to prove the required intent.

The evidence of false pretenses is thin. We know from *Williams v. United States,* 458 U.S. 279, 284–85, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), that a check is not a statement that the drawer has funds in his account sufficient to pay it, and while the prosecution in *Williams* was under the false-statement statute, 18 U.S.C. § 1014, the principle that a check is not a statement that there are funds to back it would seem to imply that the check is not a false pretense for purposes of section 2113(b) either —though, if so, many cases seem to have missed this point, because they continue to treat check kiting as a form of theft by false pretenses forbidden by section 2113(b). See, e.g., *United States v. Goudy, supra; Theron v. United States Marshal,* 832 F.2d 492, 497 (9th Cir.1987); *United States v. Khamis,* 674 F.2d 390, 395–96 (5th Cir.1982); cf. *United States v. Sterley,* 764 F.2d 530 (8th Cir.1985) (per curiam). None of these cases addresses the issue, however, so they are not authoritative on it. See *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 119 and n. 29, 104 S.Ct. 900, 918 n. 29, 79 L.Ed.2d 67 (1984); *Glidden v. Chromalloy American Corp.,* 808 F.2d 621, 625 (7th Cir.1986); *United States v. Crawley,* 837 F.2d 291, 293 (7th Cir.1988). "It is the duty of the court to deliberate.... [I]f it can be shown that, although there was deliberation, a particular point was wholly absent from the consideration of the court, then, even though that point is conceivably an important one, the connection of the decision with that point is not a connection of effect and cause, but is purely accidental, and as to that point the decision is no authority whatever." Wambaugh, The Study of Cases 24–25 (2d ed. 1894) (footnote omitted).

■ When Kucik asked for a *Williams* instruction, the district court refused on the ground that this is not a section 1014 case. But if *Williams* should be understood as holding that a check is not a representation, then Kucik was entitled to have the jury instructed not to treat the credit-union checks with which he paid for the cashier's checks as false pretenses: no representation, no pretense.

All this may be too logical, however. Neither the majority opinion nor the dissenting opinion in *Williams* mentioned section 2113(b). The focus was on section 1014, including its legislative history, and if confronted with the question presented by this case the Justices might conclude that a kited check is a false representation that can support a conviction for theft by false pretenses, though it is not a false statement. Although the field of bad-check fraud is nowadays dominated by bad-check statutes, the majority view in the states is that, under general principles of the law of theft, a check is an implied representation that the drawer has credit at the drawee bank sufficient to cover the amount of the check. See, e.g., *State v. Ringi,* 238 Kan. 523, 528, 712 P.2d 1223, 1227 (1986); LaFave & Scott, Handbook on Criminal Law 679 (1972); Perkins & Boyce, Criminal Law 386 (3d ed. 1982); 3 Wharton's Criminal Law § 426, at p. 465 (14th ed. 1980). This is a commonsense view; perhaps it survives *Williams.*

The government points out that Kucik was guilty of other misrepresentations, particularly concerning his purpose in buying a large number of cashier's checks on each of several days. *United States v. Rafsky,* 803 F.2d 105, 108 n. 2 (3d Cir.1986), suggests that a check-kiting scheme, as distinct from a single bad check, might violate section 1014 (making *Williams,* which involved such a scheme, a case about poorly drafted instructions rather than about the applicability of the statute to check kiting). The decision also suggests that such a scheme is mail or wire fraud if the other elements of those offenses are present. See *id.* at 108. Even if all this is true, Kucik would still be entitled to a new trial, because of the error (if error it was) in the instructions; the error was not harmless and would therefore require reversal even if there was other evidence of false pretenses, as probably there was.

The deeper question is whether the government has not confused theft by false pretenses with fraud. In 1984—too late to prosecute Kucik for kiting checks in 1982— Congress made bank fraud a federal crime.

See 18 U.S.C. § 1344. It did this in response to *Williams*, which had made section 1014 unusable in check-kiting cases. See S.Rep. No. 225, 98th Cong., 2d Sess. 378 (1984). The government points out correctly that section 1344 surely was not intended to amend section 2113(b) to make that statute inapplicable to check kiting. Cf. *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979); *Edwards v. United States*, 814 F.2d 486 (7th Cir.1987). But it is curious, at least, that the government would have pressed for the passage of section 1344, as it did, if the conduct sought to be punished by the new statute was already punishable under section 2113(b).

■ The government may, however, have wanted section 1344 in order to be able to deal with check kiting when it comes unembellished with misrepresentations beyond what may or may not be implied in tendering a check as part of a check-kiting scheme. That would leave open the possibility of prosecuting check kiting under section 2113(b) when there are other types of misrepresentation, even if *Williams* cannot be confined to section 1014. But is every misrepresentation by which property is obtained a false pretense under section 2113(b)? Originally a false pretense was a false token, such as a false weight or measure or a counterfeit coin. That narrow definition gave way long ago to one that equates false pretense with any untrue representation, including an implicit one. See, e.g., Perkins & Boyce, *supra*, at 363–67. Yet as an original matter bank theft by false pretenses under section 2113(b) might be distinguished from bank fraud under section 1344 along the following lines. In the false-pretense case the criminal takes property from the lawful possessor without the latter's consent, while in the fraud case the lawful possessor is deceived concerning either the identity of the person to whom he has entrusted his property or the fact of entrustment. On this analysis, if Kusik had cashed a check made out to someone else, by misrepresenting himself to be the payee, or if he had persuaded the bank's president to sign a document that Kusik had represented to

be a birthday card but was actually a cashier's check, he would have been guilty of theft by false pretenses. The bank would have thought either that it was dealing with someone else or that it was not dealing at all; in neither case would it have intended to give Kusik the face amount of the cashier's check. But in this case that is exactly what the bank intended to do. It knew who Kusik was and it intended to write him cashier's checks in the amount in which the checks were written. It was deceived not as to his identity or the nature of the transactions but as to his purposes. This made it a classic case of fraud, but on the approach we are exploring not theft by false pretenses.

The maximum prison sentence that can be imposed under section 1344 (five years) is only half that which can be imposed under section 2113(b). Although the maximum fine specified in section 1344, $10,000, is twice that in 2113(b), the difference matches the decline in the value of the dollar between 1948, when the maximum fine of $10,000 was set for section 2113(b), and 1984, when section 1344 was enacted. $10,000 in 1984 dollars is worth less than $2,500 in 1948 dollars, making the fine in 1344 roughly half the fine in 2113(b) when first set in 1948—just as the maximum prison sentence in 1344 is half that maximum in 2113(b). The difference in maximum fines has been erased by 18 U.S.C. § 3623, passed in 1984, but this does not affect our basic point, which is that theft by false pretenses appears to be perceived as the more serious of the two crimes, and this is consistent with distinguishing between the elements of false pretenses and of fraud.

All this may make sense as a matter of first principles, but it is foreclosed by authority. The cases indicate that anyone who extracts money from a bank by a deliberate misrepresentation is guilty of violating section 2113(b). See, e.g., *United States v. Goldblatt*, 813 F.2d 619, 625 (3d Cir.1987); *United States v. Bradley*, 812 F.2d 774, 777 (2d Cir.1987). Whether this is because the common law concept of theft by false pretenses has expanded, or be-

cause section 2113(b) goes beyond the common law (as suggested in *Bell v. United States, supra* ), or, as seems closest to the truth, for both reasons, makes no difference. There is thus no need to prove the kind of imposture—corresponding to a classic sense of false pretense—involved in *United States v. Morgan,* 805 F.2d 1372, 1377 (9th Cir.1986). The outer bounds are marked by *United States v. Pinto,* 646 F.2d 833, 837 (3d Cir.1981), which held that it was not a violation of the statute for the defendant to draw out money that had been deposited in his account by mistake, even though he knew of the mistake. There is thus considerable overlap between bank fraud under section 1344 and bank theft by false pretenses under section 2113(b). Except for check kiting not involving any representations beyond what is implied by the kited checks themselves, the overlap may be total. The difference in penalties is probably the same sort of anomaly that we discussed in *Edwards v. United States, supra,* and that seems to result simply from the immense complexity of the federal criminal code.

When the principle that equates false pretenses to fraud is put together with the principle that treats even a personal check on which payment is stopped as a thing of value, the stage is set for a considerable expansion in the conventional idea of theft. Suppose A purports to sell the Brooklyn Bridge to B, taking in payment B's personal check, which B stops payment on, with the result that A never receives anything. This is fraud, and attempted theft; is it completed theft? Perhaps so, see *Polisher v. State,* 11 Md.App. 555, 580–81, 276 A.2d 102, 114–15 (1971), but this we needn't decide. The taking of cash by fraudulent representations is theft by false pretenses, and we do not understand Kucik to be arguing that, if so, the substitution of a cashier's check for cash makes a legal difference.

Since there may have been enough evidence to convict Kucik of theft by false pretenses even if the kited checks themselves could not be treated as misrepresentations of the state of Kucik's account in the credit union, it becomes essential to

decide whether *Williams* applies in section 2113(b) cases. We think it does. The Supreme Court might distinguish a false statement from a false pretense, but this seems unlikely. We shall leave it to the Court to decide whether it wants *Williams* read as narrowly as the government proposes—though the passage of section 1344 has made the question largely academic.

The decision to prosecute Kucik federally is mysterious. The only real victim of Kucik's check-kiting scheme was a credit union that is neither federally chartered nor federally insured. One would think that in any rational division of functions between state and federal prosecutors, the prosecutorial responsibility should have been allocated to the state. It is none of our business how the state and federal authorities divide up prosecutions in areas of overlapping state and federal authority, see *United States v. Schwartz,* 787 F.2d 257, 266 (7th Cir.1986); *United States v. Podolsky,* 798 F.2d 177, 181 (7th Cir.1986), so if the federal government wants to retry Kucik it can. But he is entitled to a new trial, because of the error in the instructions.

REVERSED.