**Ricci Charles SIMMONS, Appellant,**

v.

**The STATE of Texas.**

No. 1840–02.

Court of Criminal Appeals of Texas.

July 2, 2003.

---

10. *See Reynolds*, 4 S.W.3d at 26 n. 5 (Meyers, J., dissenting).

Stanley G. Schneider, Houston, for Appellant.

Alan Curry, Asst. DA, Houston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

COCHRAN, J., delivered the opinion of the Court, joined by MEYERS, PRICE, WOMACK, JOHNSON, and HOLCOMB, JJ.

After appellant accepted two GEICO checks as payment for his auto theft and car storage insurance claims, he was charged with theft for making a fraudulent insurance claim. The court of appeals reversed appellant's conviction, holding that the evidence was legally insufficient to prove the value of the two checks because the State did not show that "the drawer of the check had sufficient funds to cover the check at the time the [defendant] came into possession of the check." [1] We granted review to determine what evidence suffices to prove the value of checks in a theft case.[2] We conclude that the face amount

---

1. *Simmons v. State*, 84 S.W.3d 810, 813 (Tex. App.-Houston [1st Dist.] 2002) (citing *Brown v. State*, 97 Tex.Crim. 452, 262 S.W. 479, 480 (1924)).

2. We granted the State's sole ground for re-

written on the checks and signed by the drawer is prima facie evidence of the value of the checks. That evidence, coupled with testimony that appellant willingly exchanged his insurance claims of over $4,800 for two checks totaling that amount, is sufficient to prove that the checks were "property of the value of more than $1,500 but less than $20,000." We therefore reverse the judgment of acquittal by the court of appeals and remand for consideration of appellant's remaining claims.

## I.

In a bench trial, the State offered evidence that Houston Police Department ("H.P.D.") officers and F.B.I. agents set up a sting operation to buy stolen cars. They opened a warehouse called "H. T. Exports" and spread the word that this company would buy stolen cars. In March of 1998, appellant's mechanic, Larry Davenport, contacted H.T. Exports about selling appellant's 1980 Porsche. Mike Murnane, an H.P.D. sergeant acting as H.T. Export's "buyer," agreed to buy the car. Davenport then had the inoperable Porsche towed to the warehouse. Davenport told Murnane that he was going to do an "insurance rip" on the car. Davenport said that he would call Murnane before he reported the car stolen to make sure that Murnane had gotten rid of it.

Murnane held the car at the warehouse for about ten days, and then he had it towed to Safeway Storage. In October of 1998, appellant received notice from Safeway Storage that his car was there. When appellant went to the storage facility, he learned that the F.B.I. had placed a "hold" on his car.

On January 13, 1999, appellant made the first of a series of calls to GEICO Insurance Company. He reported to GEICO that he had left his Porsche at his mechanic's shop in September of 1998, and that it had been stolen off that lot, but it had been recovered by H.P.D. and was in storage. Thereafter, appellant paid $1,242 to get the car out of storage. Appellant later told GEICO that he had purchased the car for $20,000, that it had been stolen in October of 1998, and that he had reported it stolen to the police that same month. Appellant said that the car had been damaged and various items were stolen out of it. Appellant did make a police report, but not until January, 1999. He told the police that he had last seen the car on November 15, 1998. He said the car was now in bad condition and had been burglarized of a stereo, battery, and some fire-fighting equipment. Appellant ultimately made insurance claims based on his losses and storage costs and provided GEICO with the police report, a repair estimate, storage receipt, and a service receipt showing the stereo installation.

GEICO, meanwhile, had been informed of the undercover operation and had been monitoring appellant's file for law enforcement. GEICO adjustors were independently concerned about appellant's claims because of his delay in reporting the theft, the condition of the car, and the discrepancies in his statements and reports. Nevertheless, at the direction of law enforcement, GEICO authorized the issuance of two claims checks for theft loss and storage costs, totaling $3,640 and $1,243.04. Appellant came to the GEICO claims office to pick up the two checks. As he left the office, he was arrested for theft.

■ Appellant, a retired fireman, testified and insisted that his insurance claims were valid. Nonetheless, the trial court

view:
The First Court of Appeals erred in holding that, in order to prove value in a prosecution for theft, the State was required to

prove that the insurance company, from whom the appellant fraudulently took two checks, had sufficient funds in order to pay the checks.

convicted appellant of theft of property of the value of more than $1,500 but less than $20,000. The court of appeals, however, reversed and rendered a judgment of acquittal, stating that:

> Through its cursory presentation, the State failed to present any evidence that there were sufficient funds on hand to cover the checks at the time appellant came into possession of them. Nor did the State present any evidence that the checks would have been paid if presented. Thus, after viewing the evidence in the light most favorable to the verdict, we cannot conclude that any rational trier of fact could have found that the essential element of the value of the checks was proven beyond a reasonable doubt.[3]

We consider only the narrow question of whether the State offered legally sufficient evidence to prove that the two checks were property of the value of more than $1,500 but less then $20,000. In evaluating that question, we must view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found that the State proved that value beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

---

**3.** *Simmons,* 84 S.W.3d at 813–14 (citations omitted).

**4.** TEX. PENAL CODE § 31.03. Subsection (d) of this statute provides that it is not a defense to prosecution under this section that:
(1) the offense occurred as a result of a deception or strategy on the part of a law enforcement agency, including the use of an undercover operative or peace officer;
(2) the actor was provided by a law enforcement agency with a facility in which to commit the offense or an opportunity to engage in conduct constituting the offense; or
(3) the actor was solicited to commit the offense by a peace officer, and the solicitation was of a type that would encourage a person predisposed to commit the offense to

## II.

■ A person commits the state jail felony offense of theft if "he unlawfully appropriates property with intent to deprive the owner of property" and "the value of the property stolen is $1,500 or more but less than $ 20,000."[4] "Property" subject to theft can be real property, personal property or a "document, including money, that represents or embodies anything of value."[5] In this case, the State alleged that appellant:

> "on or about MAY 27, 1999 did then and there unlawfully, appropriate, by acquiring and otherwise exercising control over property, namely, TWO CHECKS, owned by SANDY PORTER, hereafter styled the Complainant, of the value of over one thousand five hundred dollars and under twenty thousand dollars, with the intent to deprive the Complainant of the property."[6]

Based on this pleading, the State had the burden to prove that the documents, the two checks from GEICO, had a monetary value within that range.[7]

Under section 31.08(b) of the Penal Code, the value of documents, other than those having a readily ascertainable mar-

---

actually commit the offense, but would not encourage a person not predisposed to commit the offense to actually commit the offense.

**5.** TEX. PENAL CODE § 31.01(5). Both parties agree that the two GEICO checks are section 31.01(5)(C) property—documents that represent or embody value.

**6.** Sandy Porter is the GEICO claims adjuster who authorized the checks paid to appellant. Appellant was originally indicted for insurance fraud, but the State later refiled the case as a theft offense.

**7.** *Sanders v. State,* 664 S.W.2d 705, 709 (Tex. Crim.App.1984)("the value of the property stolen is an essential element of the offense

ket value, is: "(1) the amount due and collectible at maturity less that part which has been satisfied, if the document constitutes evidence of a debt; or (2) the greatest amount of economic loss that the owner might reasonably suffer by virtue of loss of the document, if the document is other than evidence of a debt." [8]

Do signed checks which are made payable to a specific person have a readily ascertainable market value? Common sense and case law from other jurisdictions [9] suggest that the answer is "no." While "market value" is not statutorily defined in the Texas Penal Code, this Court has defined the phrase "fair market value" as the dollar amount the property would sell for in cash, given a reasonable time for selling it.[10] Put otherwise, fair market value is "the price the property will bring when offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying." [11] An unendorsed check made out to a specific person does not have a readily ascertainable market value because there is not much of a commercial market for unendorsed checks. Thus, although a check that is made out to "Ricci Charles Simmons" may have great value to both its maker and its intended recipient, Mr. Simmons, it has very little legal commercial market value unless and until it is endorsed.

Documents which do have a readily ascertainable market value are items such as public and corporate bonds and securities.[12] They are freely negotiable and usually do not, on their face, designate a specific payee. A check then, must be worth either "the amount due and collect-

---

when it is made the basis of punishment") (op. on reh'g); *Christiansen v. State*, 575 S.W.2d 42, 44 (Tex.Crim.App.1979)("[r]eceipt of property and proof of its value are critical elements in the offense of theft"); *Peoples v. State*, 566 S.W.2d 640, 641 (Tex.Crim.App. 1978)(in theft indictment, "the value of property must be stated where it is made the basis of punishment; and the injury done to the owner of property must be averred where the amount of injury is an essential element in the punishment").

**8.** Tex. Penal Code § 31.08(b). *See, e.g.*, 52A C.J.S. Larceny § 60(2)(b) ("in a prosecution for the theft of evidences of debt, such as bonds, promissory notes, bills of exchange, checks, or public securities, the value of the instrument is measured according to the standard set up in the statute.... In the absence of statute, ... the value of a check is usually held to be the amount for which it is drawn, but, if the check is worth less than that amount, its actual or market value seems to be the determinative factor").

**9.** *See, e.g., United States v. Cianscewski*, 894 F.2d 74, 80 (3rd Cir.1990)(noting that "when a thief sells his stolen checks at a discount, the 'market value' of the stolen checks does not adequately measure the harm of his ac-

tions on the victim of the theft"); *LeFlore v. State*, 17 Ark.App. 117, 124, 704 S.W.2d 641, 646 (1986) (stating that while signed checks do not have a readily ascertainable market value, they can be valued as the greatest amount of economic loss that the owner might reasonably suffer by virtue of their loss); *State v. Martines*, 705 A.2d 1116, 1117 (Me.1998) (although fair market value of property at the time and place of the crime is the standard for assessing the value of stolen property, under statute, the value of a written instrument which does not have a readily ascertainable market value, such as a check, draft, or promissory note is deemed to have the value of the amount due or collectible).

**10.** *Keeton v. State*, 803 S.W.2d 304, 305 (Tex. Crim.App.1991).

**11.** *Id.* at 306 (Clinton, J., concurring); *see also City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex.1972); *City of Austin v. Cannizzo*, 153 Tex. 324, 267 S.W.2d 808, 815 (1954); *State v. Carpenter*, 126 Tex. 604, 618, 89 S.W.2d 194, 202 (Comm.App.1936).

**12.** *See, e.g., Connecticut v. Desimone*, 241 Conn. 439, 441, 696 A.2d 1235, 1237 n. 4 (1997), observing that Connecticut's theft statute provides:

ible" if it is evidence of a debt or "the greatest amount of economic loss that the owner might reasonably suffer" by his loss of the check if that check is not evidence of a debt.[13]

Regardless of whether a check is viewed as evidence of a debt or not,[14] the vast majority of American jurisdictions hold that "the value of a check, in the absence of proof to show a lesser value, is measured by what the owner of the check could expect to receive for the check at the time of the theft, i.e., the check's face value."[15] The majority view is based upon the notion that the amount written upon the face of a signed check is competent evidence of its value.

Whether or not they have been issued or delivered, written instruments, except those having a readily ascertainable market value such as some public and corporate bonds and securities, shall be evaluated as follows: (A) The value of an instrument constituting evidence of debt, such as a check, draft or promissory note, shall be deemed the amount due or collectible thereon, such figure ordinarily being the face amount of the indebtedness less any portion thereof which has been satisfied; (B) the value of any other instrument which creates, releases, discharges or otherwise affects any valuable legal right, privilege or obligation shall be deemed the greatest amount of economic loss which the owner of the instrument might reasonably suffer by virtue of the loss of the instrument. ·

**13.** Tex. Penal Code § 31.08(a)(2)(b)(1) & (2).

**14.** Appellant and the State disagree on whether a check always, sometimes, or never constitutes "evidence of a debt." Whether a check evidences a debt depends upon the specific circumstances surrounding its issuance and the intentions of the maker and recipient. Neither the State nor appellant contend, however, that categorization of the two checks in this case as "evidence of a debt" or not, is the crucial factor in determining their "value" for purposes of this prosecution.

**15.** State v. Harris, 708 So.2d 387, 389 (La.1998)(quoting Gallegos v. State, 113 N.M. 339, 340, 825 P.2d 1249, 1250 (N.M.1992)). In Harris, the court cited, in part, to the following as supporting the majority view: United States v. Kucik, 844 F.2d 493 (7th Cir.1988) (the prima facie value of the check is its face amount); People v. Marques, 184 Colo. 262, 520 P.2d 113 (Colo.1974) (en banc) (the prima facie value of a check is its face value); Bigbee v. State, 173 Ind.App. 462, 364 N.E.2d 149 (Ind.Ct.App. 2nd Dist.1977) (the face value of a negotiable bearer instrument is the value of the instrument for purposes of grading the theft); State v. Evans, 669 S.W.2d 708 (Tenn.Crim.App.1984) (the face amount of the check represents its true value in the absence of any proof to show a lesser value because the victim was entitled to receive the face amount); State v. Pacheco, 636 P.2d 489 (Utah 1981) (per curiam) (the face value of the checks, whether endorsed or not, is prima facie evidence of the value that determines the degree and penalty relevant in a theft case); State v. McClellan, 82 Vt. 361, 73 A. 993 (Vt.1909) (the value of a stolen check is its face amount because that is the amount it was worth to the victim); and State v. Lee, 128 Wash.2d 151, 904 P.2d 1143 (.1995) (en banc) (the key in determining the value of a deprivation is the loss to the victim rather than the benefit to the offender); 50 Am.Jur.2d Larceny § 50 (1995) ("in a prosecution for theft of a check, the face amount of the instrument is presumptive evidence of its value. For the purpose of valuing stolen checks, a restrictive endorsement thereon is irrelevant."); Rollin M. Perkins and Ronald N. Boyce, Criminal Law, 338 (3d ed.1982) ("a negotiable instrument is taken at its face value so far as the law of larceny is concerned, even if it is a check on which payment has been stopped").

Other cases supporting the majority position include: United States v. Geevers, 226 F.3d 186, 192 n. 5 (3rd Cir.2000)(noting that federal theft guidelines equate intended loss with the face value of stolen checks); United States v. Cianscewski, 894 F.2d at 80 rejecting contention that district court should have valued stolen checks at the amount appellant received for them on resale, instead of at their face value; "[w]hen a check is stolen, the cost to the party who ultimately bears the loss is obviously the face value of the check"); State v. Long, 2 Neb.App. 847, 852, 516 N.W.2d 273, 276 (1994)(agreeing "with the majority view from other jurisdictions that in a theft

Under Section 3.104 of the Texas Business and Commerce Code (U.C.C.), checks are drafts payable on demand and drawn on a bank.[16] Checks are negotiable instruments and they play an important role in Texas, American, and international commercial transactions, serving, to a considerable degree, as a cash equivalent.[17] As the Colorado Supreme Court stated: "In the overwhelming majority of ordinary commercial transactions, the drawee bank will pay the face amount of the instrument, or the drawer will make good the instrument."[18] Indeed, shoppers and shopkeepers regularly and routinely rely on the promises and liabilities contained on the face of checks, and they conduct their commercial affairs accordingly.

Normally, a bank is solvent and will pay the face amount of a check drawn upon its customers' accounts. Normally, the drawer of a check has sufficient funds in his bank account to cover the amount of his signed checks. Thus, normally, the face amount of a check that is drawn and signed by a person or a corporate representative is *prima facie* evidence of the value of that check.

Accordingly, we hold that the face amount of a check is presumptive evidence of its value. Of course, there are exceptions and unusual cases in which evidence rebuts that presumption and shows that the bank is, in fact, not solvent, that the drawer does not have sufficient funds to cover the check, or that there is some other fact which negates, lessens, or perhaps even increases the face value of the check. Thus, a *prima facie* showing of value by proof of the face amount of a signed check may be rebutted with other evidence. However, assuming that no evidence is produced to rebut the logical inference that the payee was entitled to receive the face value of the check, the amount written on the check is sufficient evidence to show its value.

Our case law has not been clear on this issue because our opinions have frequently dealt with unusual, rather than normal, check situations. Indeed, Texas has been called "a minority view" due to the perception in other jurisdictions that Texas requires proof that the maker had sufficient funds in his bank account to show the value of checks in theft cases.[19] Another court, however, has pointed to Texas precedent in following the majority view that the face amount of a check is evidence of its value.[20] The problem is not that Texas

case, in the absence of a specific statutory directive determining value, the face amount of a stolen check which has been accepted in commerce is the value of the property stolen").

16. TEX. BUS. & COM.CODE § 3.104(f).

17. *See* 15–230 Dorsaneo, TEXAS LITIGATION GUIDE § 230.02.

18. *People v. Marques*, 184 Colo. at 268, 520 P.2d at 117 (citing E. FRANSWORTH & J. HONNOLD, CASES AND MATERIALS ON COMMERCIAL LAW, 47–54 (2d ed.1968)).

19. *See State v. Long*, 2 Neb.App. 847, 852, 516 N.W.2d 273, 276 (1994) (stating that "[w]e are aware of a minority view, found primarily in Texas cases such as *Cooper v. State*, 509

S.W.2d 865 (Tex.Crim.App.1974), which would require proof of the sufficiency of funds in the maker's account to determine the value of a stolen check, and we find these cases unpersuasive"); *see also State v. Harris*, 690 So.2d 999, 1004 (La.App.1997) (Byrnes, J., dissenting) (quoting *Long's* criticism of Texas view and arguing that majority was wrong to employ same logic as that apparently used in Texas cases), *rev'd*, 708 So.2d 387 (La.1998) (holding that face amount of check is *prima facie* evidence of its value).

20. *See Jeffcoat v. United States*, 551 A.2d 1301, 1303 n. 4 (D.C.1988) (stating that "[a]ccording to the weight of authority in other jurisdictions, the 'value' of a negotiable check is the amount for which it is drawn" and noting "*cf. Christiansen v. State*, 575 S.W.2d

law is inconsistent on the issue of the value of a check, but rather that we have not always clearly explained that some of our cases have dealt with unusual circumstances in which a *prima facie* showing of the face value of a check was rebutted by other evidence.

For example, in *Brown v. State*,[21] the 1924 case on which the court of appeals relied, we held that the value of that particular stolen, uncashed check depended "upon the solvency of the maker and the ability of such holder to compel payment."[22] In *Brown*, the complainant wrote a check for $87 to pay a debt owed by his Pythian Lodge to the grand lodge.[23] The grand lodge recipient, however, told the complainant that the debt was really $89.05, so the complainant put the first check into his pocket and wrote out a new one. He metaphorically, but not literally, tore up the check and replaced it with another which he gave to the grand lodge recipient.[24] Somehow the "pocket voided" check was lost, but "[l]ater it turned up" in the defendant's possession.[25] The complainant testified that, when he wrote the

original check "[w]e had that money in the bank[,]" but this Court stated that "[w]e seriously doubt if this evidence shows that when the check was found by appellant it had any value, or that its value was $87."[26] There was an indication that this Pythian Lodge might not have been entirely solvent and its bank account could not have covered both the original, "pocket-voided" check and the replacement check.[27] So, while there was evidence that the check had been made out, there was also evidence that the check was never intended to be a negotiable instrument, nor was it ever transferred to another person as a negotiable instrument. Thus, in *Brown*, there was "other evidence" which rebutted the *prima facie* value of the check as being its face amount.[28]

Similarly, in *Rasbury v. State*,[29] this Court held that the actual value of a $165 personal check signed by an elderly man with poor eyesight made out to a "doctor" with a miracle cure, was not proven when the evidence showed that the elderly man had no money in the bank.[30] In that case we said:

42, 44 (Tex.Crim.App.1979) (value of money order is determined by its face value)'').

21.  97 Tex.Crim. 452, 262 S.W. 479 (1924).

22.  *Id.* at 453, 262 S.W. at 480.

23.  *Id.* at 452–53, 262 S.W. at 480.

24.  *Id.*

25.  *Id.* at 453, 262 S.W. at 480.

26.  *Id.*

27.  *Id.* This Court explained:
> In the absence of any proof that the lodge had in the bank any funds after the giving of the second check, from which the lost check the check alleged to be stolen might have been later paid; and in the absence of any further proof of the financial ability of the lodge to remunerate any innocent holder of the check, or of the value of the check, we would be compelled to hold the record

> lacking in proof that same was of such value as to justify the jury in concluding appellant guilty of the taking of property of the value of more than fifty dollars $.
> *Id.*

28.  Our holding in this case also contemplates instances in which extrinsic evidence would not always be necessary to prove that a check is not worth its face value. For example, a pickpocket who purloins a personal check written out for 50 million dollars, payable to the order of the Pink Panther, has not committed theft of 50 million dollars because a reasonable trier of fact could not assume that such a check is, in fact, worth its face amount.

29.  136 Tex.Crim. 506, 126 S.W.2d 972 (1939).

30.  The testimony showed that: 1) the complainant told the miracle doctor that he did not have the money in the bank; 2) the complainant did not, in fact, have money in the

There is no testimony from any source that the alleged injured party had any property which could have been subjected to execution and out of which the check might have been satisfied. Nor is there any testimony that the check had any market value. In other words, had appellant offered to sell the check, it is not shown what it would have brought, if anything. It will be noted that testimony relative to the value of the check is unsatisfactory and too uncertain to sustain a conviction for a felony.[31]

In both of these cases, then, there was specific evidence which rebutted any *prima facie* showing or presumption that the face value of the checks at issue had the actual value set out on their faces. Fifty years later, however, we rejected an argument, based on *Brown* and *Rasbury*, that a stolen unendorsed check had no value because—in contrast to *Brown* and *Rasbury*—there was evidence "that the check had the value of $51.86 and, upon endorsement, could have been sold for that amount or would have been paid in the sum of $51.86 upon presentation."[32] We later held, in a theft by pretext case, that the offense of theft is complete when the defendant obtains the check if the evidence shows that "he intended at that time to keep the check."[33] Then, addressing a defendant's contention that the four money orders he obtained with a bad check had

no value because there was no proof that the money orders were in fact cashed, this Court summarily stated that "[i]t is clear that under the statutory definition [of property] the value of the money orders was their face amount ($ 240)."[34] That was a "normal" case, and this Court dealt with it in accordance with the general majority rule that checks, money orders, and other documents evidencing a debt or a promise have the value that is set out on their face, absent any evidence showing some other value.

■ Because this Court has not always explained when it was following the rule of thumb that the face value of a check is *prima facie* evidence of its value versus when it was dealing with an "unusual" situation in which other evidence rebutted any *prima facie* showing, Texas courts of appeals have also split in their discussions of how to value a check.[35] But Texas is not a "rogue" or "minority" state in commercial transactions or in the valuation of negotiable instruments. It has followed and does follow the majority rule absent special circumstances. Thus, a check is a "document that represents or embodies value" and checks embody, in the all but the exceptional cases, a value equivalent to what is written on their faces. Accordingly, we hold that the face amount of the instrument is presumptive evidence of its value. Assuming that no evidence is pro-

---

bank; and 3) the bank cashier had refused to cash the check when it was presented by the "doctor." *Id.* at 508, 126 S.W.2d at 973–74.

**31.** *Id.*

**32.** *Cooper v. State,* 509 S.W.2d 865, 867 (Tex. Crim.App.1974).

**33.** *Draper v. State,* 539 S.W.2d 61, 69 (Tex. Crim.App.1976).

**34.** *Christiansen v. State,* 575 S.W.2d 42, 44 (Tex.Crim.App.1979).

**35.** For example, in *Huff v. State,* 630 S.W.2d 909, 913 (Tex.App.-Amarillo 1982, no pet.), the court held that, based on *Christiansen, Cooper* and the definition of "property" in TEX. PENAL CODE § 31.01, "the value of a check is its face amount." On the other hand, in *Davila v. State,* 956 S.W.2d 587, 589 (Tex. App.-San Antonio 1997, pet. ref'd), the court held that, based on *Brown* and *Rasbury,* "[p]roof of theft of the value of a check requires showing the drawer of the check had funds sufficient to cover the check at the time the actor came into possession of the check."

duced to rebut the logical inference that the payee was entitled to receive the face amount of the check, it is sufficient evidence of value to show the face amount of the check.

## III.

■ Measured by these principles, the evidence in this case is sufficient to prove, beyond a reasonable doubt, that the value of the checks appellant picked up from GEICO had a value of more than $1,500 but less than $20,000. The face value of the checks, added together, falls within that range. Each check read, "Pay to the order of Ricci Charles Simmons," and each was signed by the drawer, a GEICO representative. There is also evidence that appellant willingly exchanged: 1) his insurance claim based on "loss and damage" of $3,892 for a check from GEICO for $3,642 (the amount of loss minus the $250 deductible); and 2) his insurance claim based on his storage costs of $1,242.04, for a check for that same amount from GEICO. By accepting these two checks in return for the release of his insurance claims, appellant's conduct spoke volumes. His unspoken message was that these two checks had the equivalent value of cash in payment of his asserted claims. Because appellant presented a claim to GEICO which had a total cash value of $4,884.04, and he was willing to accept two checks written for that amount, this evidence tends to prove that appellant considered the checks as the equivalent of $4,884.04 in cash.

Although the checks were issued under the direction of law enforcement and the National Insurance Crime Bureau, they were nevertheless real checks, authorized by a real GEICO claims adjustor. It is true that the State produced no evidence that there were sufficient funds in GEICO's bank account to cover the checks when appellant took possession of them, or that the checks would actually have been honored if presented. But there was also no rebuttal evidence (*i.e.,* no evidence that there were *not* sufficient funds on hand to cover the checks, or that the checks would *not* have been paid if presented). Even if there had been evidence that GEICO might have put a stop order on payment, that evidence would not affect the value of the checks or their negotiability when appellant accepted the checks in exchange for his claims.[36] And that was the moment at which the alleged theft occurred.

■ In each case, the relevant question is whether sufficient evidence exists in the record to support a finding by a rational trier of fact that a check has the actual monetary value alleged in the indictment. Although an instrument's face value will not always provide a sufficient indicator of the loss incurred by the theft of that instrument, if the instrument is authentic, the face value is generally *prima facie* evidence of its value. In this case, the

36. As Judge Posner put it: "The theft of a personal check is a theft from the drawer or the bearer. The amount of the theft is, prima facie, the face amount of the check, and the prima facie case of theft is not rebutted by showing that payment was stopped on the check; it is enough if the check could have been negotiated[.]" *United States v. Kucik,* 844 F.2d 493, 497 (7th Cir.1988)(internal citation omitted). While GEICO suffered no actual loss in this case, that is, as Judge Posner states:

... often true in cases of theft. If the stolen property is returned promptly there may be no loss (imagine that cash were stolen from the bank's vault at midnight and recovered at 1:00 a.m.). Proof of loss is important in a civil case but usually is not required in a criminal case. It would thus be cutting things too fine to distinguish between thefts of cash and thefts of cashier's checks.

*Id.* (citation omitted).

evidence of: 1) the face value of the two checks; and 2) appellant's willingness to exchange his insurance claims totaling more than $4,000 for those two checks was sufficient to prove theft of property of a value of more than $1,500 and less than $5,000 as alleged in the indictment.

We therefore reverse the judgment of acquittal entered by the court of appeals and remand the case to that court to consider appellant's remaining claims.

KELLER, P.J., filed a concurring opinion, joined by KEASLER and HERVEY, JJ.

KELLER, P.J., filed a concurring opinion in which KEASLER, and HERVEY, JJ., joined.

In a challenge to the sufficiency of the evidence the issue is whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1] The pertinent question in this kind of theft case, then, is whether a rational trier of fact could determine the value of a check on the basis of its face value alone.

In this day and age, checks are widely recognized as payment instruments in commercial transactions. People expect—and have a right to expect—that a check written for a certain amount will be honored for that amount. In rare circumstances a check may not be honored, such as when a check "bounces" due to insufficient funds, when a check is not honored due to a stop payment, or as in this case, when the intended victim successfully prevents the perpetrator from delivering the check to a financial institution for cash or deposit. By distinguishing *Brown* rather

than overruling it, the Court draws a distinction between the first situation and the latter two.[2] In my opinion, the value of a check in each of these three situations is the face value of the check.

The outcome of the three exceptional situations is the same: the perpetrator is prevented from successfully cashing or depositing the check. Either the check has its face value or it has *no* value-there is no in-between. One cannot distinguish these situations by saying that, in the first, the check writer had no intention of paying. The same could be said of GEICO, in the present case, and could be true in a stop payment case as well. And such a statement would not necessarily be accurate. A check writer might believe he would have sufficient funds to cover the check at the time it was written, even though that may later turn out not to be the case. Nor can a distinction be drawn based upon whether there presently exist sufficient funds to cover the check. A check writer who has insufficient funds may intend to deposit sufficient funds to cover the check shortly after it is written. If such funds are in fact deposited before the check clears (which, for example, can ordinarily be accomplished by depositing the funds later in the day), then the recipient of the check will be able to cash the check, and no one would argue that the check was worth anything less than the face value. On the other hand, a check writer may have sufficient funds in his account when the check is written, but the check could still bounce if the account has been depleted by the time the check is presented to the bank.

Moreover, even if the check writer's account contains insufficient funds, the bank may honor the check anyway, either be-

1. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

2. *Brown v. State*, 97 Tex.Crim. 452, 262 S.W. 479 (1924).

cause it has an overdraft protection agreement with the account holder or because the bank simply has a policy of cashing checks up to a certain amount and seeking reimbursement (plus service fees) from the account holder. Are we prepared to distinguish between checks that have value and those that do not based solely upon the insufficient funds policy of a particular bank? And what if a bank's decision to honor or not honor a particular check is arbitrary?

All of these factors have nothing to do with the intent, or the reasonable expectations, of someone who accepts a check. Instead of developing an intricate set of rules for determining a check's value, we should recognize what our economic system generally presupposes: the face value of the check is the value of the check. I would overrule cases holding to the contrary.

With these comments, I concur in the Court's judgment.