IN THE COURT OF CRIMINAL APPEALS


OF TEXAS







No. AP-74,671






ROBERT LESLIE ROBERSON, III, Appellant



v.



THE STATE OF TEXAS







Appeal of Case 26,162 of the Third Judicial District Court of


Anderson County






 Womack, J., delivered the opinion of the Court, in which Keller, P.J., and
Meyers, Johnson, Keasler, Hervey, Holcomb, and Cochran joined. Price, J.,
concurred in the judgment.



 A jury found the appellant guilty of the capital murder of Nikki Curtis, his two-year-old
daughter. (1) The jury rendered a verdict on the issue of punishment that required the trial court to
sentence the appellant to death. (2) In the appeal to this court, which a statute requires, (3) the appellant
raises thirteen points of error. We find no merit in them, and we affirm the judgment.

Sufficiency of the Evidence

 In his sixth point of error, the appellant contends that the evidence at trial was legally insufficient
to support the verdict. We evaluate legal sufficiency claims under the standard first articulated by the
Supreme Court in Jackson v. Virginia. (4) That is, we view the evidence in the light most favorable to the
verdict to determine whether any rational trier of fact could have found that the State proved the
elements of the charged offense beyond a reasonable doubt. (5)

 The substance of the appellant's argument on this point concerns the element of intent. He
asserts that the evidence presented by the State as to his intent was insufficient to prove that he
knowingly or intentionally committed the murder of a child under the age of six, or that such evidence
was just as consistent with a finding that the appellant committed a lesser-included offense, and
therefore could not be the basis of finding him guilty of capital murder beyond a reasonable doubt. 

 The State called twelve witnesses during its case-in-chief. Among them was Kelly Gurganus, a
registered nurse, who testified that she was working in the emergency room of the Palestine Regional
Medical Center when the appellant came in, pushing a wheelchair in which sat his girlfriend Teddie
Cox. Gurganus said Teddie was holding something in her lap, covered in a blanket or coat of some
sort. Teddie told Gurganus, "She's not breathing," at which point Gurganus removed the covering and
saw Nikki Curtis lying in Teddie's lap, limp and blue. Gurganus described Nikki as being like a rag
doll, and said that in her five years of nursing she had never seen anyone appear that shade of blue, not
even a drowning victim. Gurganus immediately took Nikki to a trauma room and called a doctor. 

 Gurganus further testified that when she laid Nikki down on the bed in the trauma room, she
saw bruising on Nikki's body, including on her head. She said that she then spoke with the appellant
and asked him what happened, and that he told her that Nikki's injuries were the result of falling off of
the bed. She said she immediately became suspicious because that story seemed implausible in light of
the severity of Nikki's injuries. She instructed the director of nurses to call the police.

 Gurganus spoke again with the appellant and said that he appeared nervous and anxious. She
also said that he never once asked her about Nikki's condition, and that he was not crying. She said
that she attempted to speak with Nikki's maternal grandparents, who had also come to the hospital, but
that the appellant prevented her from doing so. That was the extent of her conversation with the
appellant, except that he did approach her at some point later to say he loved his daughter and that he
would never mean to hurt her. The State also called Robbin Odem, the chief nursing officer at Palestine
Regional Medical Center, who testified to her own observations of Nikki's extensive head injuries, as
well as her similar interaction with, and impression of, the appellant in the emergency room that night. 

 Dr. John Ross, the pediatrician who examined Nikki the day she died, testified that she had
bruising on her chin, as well as along her left cheek and jaw. Dr. Ross said she also had a large
subdural hematoma, which he described as "bleeding outside the brain, but inside the skull." He said
there was edema on the brain tissue, and that her brain had actually shifted from the right side to the left.
He said that, in his opinion, Nikki's injuries were not accidental but instead intentionally inflicted. 

 Dr. Thomas Konjoyan, the emergency room physician who treated Nikki the day she died, also
testified that she had bruising on the left side of her jaw, and that she had uncal herniation, which is
"essentially a precursor to brain death." Dr. Konjoyan said that the severity of the swelling in Nikki's
brain necessitated her transfer to the Children's Medical Center in Dallas for pediatric neurosurgical
services. He said that, in his opinion, it would be "basically impossible" for such an injury to have
resulted from a fall out of bed. Dr. Jill Urban, a forensic pathologist for Dallas County, testified for the
State that she performed the autopsy on Nikki and concluded that Nikki died as a result of "blunt force
head injuries."

 The jury also heard from Courtney Berryhill, Teddie Cox's eleven-year-old niece, who testified
that sometimes she spent the night at the home where the appellant lived with Teddie, Nikki, and
Teddie's ten-year-old daughter Rachel Cox. Courtney said that she once witnessed the appellant shake
Nikki by the arms in an attempt to make her stop crying. Rachel Cox then testified that the appellant
had a "bad temper," and that she had witnessed him shake and spank Nikki when she was crying.
Rachel said she had seen this happen about ten times. She also recalled a time that the appellant
threatened to kill Nikki.

 Finally, Teddie Cox testified for the State. Teddie said that, although Nikki was not her
biological child, she loved Nikki as her own. At the time she moved in with the appellant, Nikki was
living with her maternal grandparents, the Bowmans. Teddie said that the appellant had no interest in
gaining custody of Nikki but did so only because Teddie wanted to care for Nikki, and so she - along
with the appellant's mother - prodded the appellant to seek custody of Nikki. They did, and Nikki
came to live in their home in November of 2001. Teddie said that, although she and Rachel were both
very close with Nikki, the appellant was not, nor did he seem to care about her. She said that Nikki did
not like to be around the appellant and would cry every time he tried to pick her up or play with her.

 Teddie testified that the appellant had a bad temper, and that he would yell at Nikki when she
cried, which apparently happened every time he approached her. Teddie said she once heard the
appellant yell at Nikki: "If you don't shut up I'm going to beat your ass." She also said that the
appellant would hit Nikki with his hand and also once with a paddle. She said that on that occasion she
told the appellant that he should not do that because Nikki was a baby. That whipping left bruising on
Nikki's buttocks which the Bowmans later noticed. Teddie said that, when the Bowmans asked about
it, the appellant told them that Rachel did it. She said that she confronted the appellant about the
incident and that he promised her he would never hit Nikki again.

 Teddie also testified that she witnessed the appellant, when he was angry at Nikki, pick her up
off the bed, shake her for a few seconds, and throw her back on the bed. This upset Teddie, and she
briefly left the appellant's home with Rachel, but the appellant apologized and convinced her to return.
According to Teddie, this incident happened within a month of Nikki's death.

 Teddie testified that, on the evening of January 30, 2002, Teddie was in the hospital after
undergoing a hysterectomy procedure. Nikki was staying with the Bowmans, but Mrs. Bowman
became ill, so it became necessary for the appellant to pick up Nikki and look after her. Teddie said
the appellant seemed mad about this development, because he preferred to stay with her in her hospital
room watching a movie on television. Teddie said the appellant had never once before been asked to
be the sole caretaker of Nikki. She said the appellant did not leave immediately, but waited quite a
while and, when he finally did leave, he was mad.

 The next morning, Teddie was told she was being released. When she spoke to the appellant
about picking her up, he said that he was bringing Nikki to the hospital because she wasn't breathing
and he couldn't get her to wake up. Teddie noted that he did not seem upset about the situation. She
called him back five minutes later, but he still had not yet left the house, so she urged him to do so. She
then went to the nurse's desk to get a wheelchair so she could make her way downstairs to meet them
as they arrived. The appellant eventually pulled into the parking lot. Teddie said he did not seem to be
moving urgently and in fact found a parking spot instead of pulling up to the front door. Nor did he
seem to be in any hurry to get Nikki out of the car.

 Teddie urged him to bring Nikki to her, and he did. Teddie said Nikki was limp, blue, and did
not appear to be breathing. Teddie said she asked the appellant what happened, and he said that they
had fallen asleep in bed while watching a movie and that he awoke to her crying near the foot of the
bed, on the floor. He said he made sure that she was okay and then brought her back into bed with
him, and they went back to sleep. Teddie said she was skeptical of this story, because, in her experience, Nikki would always cry for Teddie when the appellant tried to sleep in the bed with her. In fact,
Teddie said, the appellant later did tell her that Nikki was crying for her.

 Nikki died from her injuries after being taken to the hospital in Dallas. Teddie could not
accompany Nikki when she was taken to Dallas, but she did not want to return to the appellant's home,
so she took her daughter to stay with a relative. In the ensuing weeks, she spoke with the appellant
occasionally, and she said he never once mentioned Nikki, and that when she did he expressed no
interest in talking about her. Teddie said he did not seem sad or emotionally distraught, but that he just
showed no interest. At one point, while the appellant was in the Anderson County Jail, Teddie said she
asked him directly if he had killed Nikki. She said his response was that if he did do it, he didn't
remember; that he might have "snapped," but that he doesn't remember doing so.

 In his case-in-chief, the appellant called Patricia Conklin, Teddie's sister, who testified that, in
her opinion, the appellant had a loving relationship with Nikki. She said that in her experience she had
never seen the appellant spank Nikki, but that she had once seen Rachel do so. She also said that, in
her opinion, Teddie had a poor reputation for truthfulness.

 The appellant's argument for legal insufficiency focuses almost entirely on the issue of intent. He
contends that the evidence failed to prove beyond a reasonable doubt that he acted intentionally or
knowingly: 

 Given the fact that the objective evidence introduced during the trial was consistent with
the scenario of an act of rage, loss of control or emotional outburst, it is not sufficient to
provide the requisite conclusion of the specific intent or knowledge to take the life of the
child. (6)


 The appellant specifically focuses on the testimony of Janet Squires, M.D., a board-certified
pediatrician who testified for the State. Dr. Squires examined the victim shortly before she died from
massive head trauma and concluded that she had been the victim of child abuse. She was asked about
her conclusions on direct examination:

 [The State]: All right. And so do you feel like this child was the victim of child
abuse?


 [Dr. Squires]: Yes.

 

 Q: Child abuse, does that mean accidental?

 

 A: It means non-accidental.


 Q: It means intentional?


 A: I don't know intentional. It means inflicted. Our words are non-accidental
inflicted trauma, abusive trauma.

 

 During cross-examination of Dr. Squires, the following exchange occurred:

 

 [Appellant's Counsel]: You also said that intentional is not a term that y'all like
to use; is that correct?


 [Dr. Squires]: That's correct.


 Q: Is that because that really doesn't have a medical aspect?


 A: I would even agree with that, yes.


 Q: Okay.


 A: It was a term that in our medical -- we used to use words like intentional
and non-intentional injury. Those were common to be used and about 10 years ago it
sort of became obvious that we don't always know intent. So from a medical standpoint we use much more inflicted versus non-inflicted, accidental versus non-accidental.

 

 The appellant seizes upon these portions of Dr. Squires's testimony as negating any possibility
that his intent could be inferred by the nature of Nikki's injuries, or at least negating his intent to commit
capital murder. However, we find Dr. Squires's testimony as quoted here unremarkable, in the sense
that, rather than negating the appellant's intent, she appeared to be merely refraining from testifying to
an ultimate issue of the case - the appellant's guilt. As a doctor, it is entirely prudent for her to only
testify as to what she could conclude medically from her examination of Nikki.

 Moreover, proof of a culpable mental state almost necessarily relies on circumstantial
evidence. (7) Therefore, it is entirely appropriate for a fact finder to infer intent, regardless of whether any
witness can or cannot testify to direct knowledge of someone's intent. We have consistently held that a
rational fact finder could infer knowledge and intent from conduct of, remarks by, and circumstances
surrounding the acts engaged in by, the accused. (8)

 Therefore, regardless of Dr. Squires's opinion of the appellant's intent, the jury could have
reasonably inferred the appellant's intent from the severity of Nikki's injuries as well as from the
testimony of three other doctors who examined her and concluded that such injuries must have resulted
from intentional blows to her head rather than from an accidental fall off the bed, as the appellant
claimed. It was undisputed that the appellant was alone with Nikki's when she suffered the injuries. The
jury also heard testimony that the appellant had a bad temper and that he would be set off by Nikki's
crying, which she seemed to always do in his presence. When viewed in a light most favorable to the
verdict, the evidence would allow a rational jury to find beyond a reasonable doubt that the appellant
intentionally or knowingly caused Nikki's death. Point of error six is overruled.

 In his seventh point of error, the appellant claims the evidence at trial was factually insufficient to
support the guilty verdict.

 In a factual sufficiency review, we view all the evidence in a neutral light, both for and
against the finding, and set aside the verdict if proof of guilt is so obviously weak as to
undermine confidence in the jury's determination, or the proof of guilt, although
adequate if taken alone, is greatly outweighed by contrary proof. In conducting such a
review, we consider all of the evidence weighed by the jury, comparing the evidence
which tends to prove the existence of the elemental fact in dispute to the evidence which
tends to disprove it. We are authorized to disagree with the jury's determination even if
probative evidence exists which supports the verdict, but we must avoid substituting our
judgment for that of the fact-finder. (9)


 The appellant's argument on this point essentially rehashes the argument he made in point of
error six, again citing Dr. Squires's testimony about intent. The evidence in support of the verdict is
detailed above. Viewing it in a neutral light, we do not find that the proof of guilt is so obviously weak
as to undermine confidence in the jury's determination, or that the proof of guilt is greatly outweighed
by contrary proof. In his defense case-in-chief, the appellant called one witness, Ms. Conklin, in an
attempt to impeach the credibility of Teddie Cox and counter her testimony as to the appellant's
relationship with Nikki. The defense cross-examined all of the State's testifying medical experts, but did
not generally contest that the appellant was responsible for Nikki's injuries. Rather, the appellant's
theory at trial -- and the basis for his factual-sufficiency claim on appeal -- was that the evidence did
not prove that he had the necessary intent to have committed capital murder. Viewing the evidence
neutrally, we find it factually sufficient to support a finding that he did have such intent, and that such a
finding is not against the great weight and preponderance of the adverse evidence presented. Point of
error seven is overruled.

Trial Court Objections

 In his fifth point of error, the appellant claims that the trial court erred in denying his motion to
sever under Section 3.04 of the Penal Code.

 The first count of the indictment contained two paragraphs alleging capital murder. The first
alleged that the appellant caused the death of a person under six years of age. (10) The second alleged that
the appellant committed capital murder by causing the victim's death while in the course of committing
aggravated sexual assault. (11) The appellant filed a pre-trial motion to sever the two capital-murder
paragraphs of the indictment, on the grounds that the State intended to introduce numerous incidents of
extraneous conduct in support of the sexual-assault predicate count, and that such evidence would be
irrelevant to the other capital count, and prejudicial because the autopsy report found no evidence of
sexual assault on the victim's body. (12) 

 In a pretrial hearing, the trial court denied the motion. When the State rested its case-in-chief, it
abandoned the sexual-assault predicate capital-murder count. The appellant then moved for a mistrial
based on the trial court's denial of his motion to sever, and that motion was denied.

 Section 3.04(a) says, "Whenever two or more offenses have been consolidated or joined for
trial under Section 3.02, the defendant shall have a right to severance of the offenses." We have held
that an indictment may contain as many separate paragraphs charging the same offense as is necessary
to meet the contingencies of evidence. (13) Where an indictment charges different theories under which a
defendant may have committed a single capital murder, Section 3.04(a) is inapplicable. (14) Here, the
appellant argues that he was harmed by the trial court's decision in this case to "support the continued
joinder of the two capital counts." The record, however, shows that no such thing happened. The
indictment in this case did not allege two separate offenses, but rather one offense (capital murder)
under two different theories ( the victim was under six years of age, and the murder was committed in
the course of committing aggravated sexual assault). The trial court did not err by denying the appellant's motion to sever under Section 3.04. Nor did the trial court's ruling implicate, much less violate,
any of the appellant's federal constitutional rights, as he claims. Point of error five is overruled.

 In his eleventh point of error, the appellant claims that the trial court erred by refusing to admit
the testimony of John Claude Krusz, M.D. The appellant offered the testimony of Dr. Krusz toward the
end of his case-in-chief. The State objected and was granted the opportunity to conduct a voir-dire
examination of Dr. Krusz outside the presence of the jury. Dr. Krusz testified on voir dire that he had
examined the appellant and concluded that the appellant suffered from organic brain syndrome (or more
specifically, post-concussional syndrome), which caused him to have poor impulse control and difficulty
making rational decisions. The State objected that the testimony amounted to a diminished-capacity
defense, which is not recognized as a legal justification for criminal acts. After the voir dire examination
of Dr. Krusz, the trial court expressed reservations about the admissibility of his testimony:

 [The Court]: Gentlemen, to be honest with you, as I listened to
the doctor testify, that was my concern is, we're getting into the, you
know, the negation, as they say of intent that he cannot form intent or
knowledge in his mind to commit a crime.


 [Appellant's Counsel]: That's not all this doctor is testifying to,
your honor. First of all, it's saying how he effects [sic], not that there's
an absolute absence, but of how it affects his ability to form intent and
knowledge. Further, the doctor I believe will testify that are certain
stress factors, particularly the situation that is the subject will present an
emotional response, your Honor. The jury has the obligation to find
intentional and knowing conduct. There are also other culpable mental
states that we're going to request that the Court put before this jury and
I believe those type, the type of organic brain injury that my client
suffers has a direct and loathing effect as to whether he was in one of
those intents or whether or not he was acting primarily upon an emotional basis. 


The trial court ultimately agreed with the State and excluded Dr. Krusz's testimony from the guilt-innocence phase of the trial.

 Since this case was originally briefed, we handed down our decision in Jackson v. State, (15) and
both parties have submitted supplemental briefs citing it.

 In Jackson, we reiterated that Texas does not recognize "diminished capacity" as an affirmative
defense, i.e., a "lesser form of the defense of insanity." (16) We distinguished, however, the situation in
which mental-health evidence is presented, not as part of an attempted affirmative defense, but instead
as an attempt to negate the mens rea element of the charged offense. In that case, such evidence is
admissible, assuming it meets the requirements of Rule 403. (17) We said:

Even if evidence is relevant to an element of the offense, the trial court
still must determine whether the evidence is admissible. Therefore, the
trial judge has discretion to determine whether evidence of mental
illness may be presented to negate the element of mens rea, or whether
the evidence should be excluded on special grounds. (18)

 We found in Jackson that the appellant had been able to present extensive evidence of his
mental illness. Therefore, the trial court did not abuse its discretion by sustaining the State's objection to
the appellant's improper closing argument that the jury should find that the appellant "lacked the mental
capacity to intentionally or knowingly cause bodily injury." 

 After Jackson, the Supreme Court also decided a case in this area. In Clark v. Arizona, (19) the
Supreme Court held that Arizona's exclusion of expert testimony about mental incapacity, except when
raising the insanity defense, did not violate due process. (20) The Court categorized mental-health
evidence bearing on mens rea into three types: "observation evidence," "mental-disease evidence" and
"capacity evidence." (21) The latter two categories are relevant here. "Mental-disease" evidence includes
opinion testimony that a defendant suffered from a mental disease with features described by the
witness. "Capacity evidence" includes opinion testimony of a defendant's capacity for cognition, moral
judgment, and, ultimately, his capacity to form mens rea. The Supreme Court said that these categories
have the potential to mislead the jury since the medical classifications of mental disease "tell us little or
nothing about the ability of the defendant to form the mens rea or to exercise the cognitive, moral or
volitional capacities that define legal sanity." (22) It said, however, that every state is free to choose
whether it wishes to "channel" mental-health evidence exclusively to the legal insanity defense:

It bears repeating that not every State will find it worthwhile to make the judgment
Arizona has made, and the choices the States do make about dealing with the risks
posed by mental-disease and capacity evidence will reflect their varying assessments
about the presumption of sanity as expressed in choices of insanity rules. (23) 


 Acknowledging this ruling, we adhere to our decision in Jackson and will continue to give the
trial judge discretion to determine whether mental-health evidence proposed by the defendant is
relevant to mens rea and admissible. In the instant case, we find that the trial judge did not abuse his
discretion in denying the appellant's request to call Dr. Krusz. The witness's proposed testimony
regarding organic brain syndrome and poor impulse control is not relevant as to the appellant's ability to
form the requisite mens rea for the offense. It appears that it was merely being used as a mental-health
defense not rising to the level of insanity. Point of error eleven is overruled. 

Punishment Phase Issues


 In his twelfth point of error, the appellant asserts that the jury instructions on punishment
violated his Sixth, Eighth, and Fourteenth Amendment rights by diluting the burden of proof on the two
punishment special issues. In support of his claim, he submits the affidavit of one juror, which he
suggests shows that the jury misunderstood what burden of proof was required of the State on Special
Issue No.1, (24) and that the jury mistook the meaning of "society" in the context of Special Issue No. 1
as referring to society at large rather than the society of a penitentiary.

 Generally, we review a jury charge under a two-step process: first, we determine whether the
charge was some way erroneous, and second, if error is found, we conduct a harm analysis to decide if
a reversal is warranted. (25) 

 The relevant parts of the jury charge on punishment in this case read as follows:

The burden of proof for Special Issue No. 1 rests upon the State, and it
must prove the issue beyond a reasonable doubt.


******


The burden of proof in this phase of the trial rests upon the State and
never shifts to the Defendant. The law does not require a Defendant to
prove that the answer to Special Issue No. 1 should be answered "No"
nor that the answer to Special issue No. 2 should be "Yes", nor does it
require the Defendant to produce any evidence at all.


****


Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is
a probability that the defendant, ROBERT LESLIE ROBERSON III
would commit criminal acts of violence that would constitute a continuing threat to society? 

 

 We find no error in these instructions as worded. Contrary to the appellant's suggested
objections, the inclusion of the word "probability" in the wording of Special Issue No. 1 does not
unconstitutionally conflict with the words "beyond a reasonable doubt" in the same sentence. (26) Nor is it
relevant whether the jury considered society to mean "prison society" or "society at large." (27) Finding no
error in the jury instructions, we need not conduct any harm analysis. Point of error twelve is overruled.

 In his thirteenth point of error, the appellant asserts that the evidence presented at the punishment phase was insufficient to support the jury's answer to the special issue on future dangerousness,
resulting in a violation of his Sixth, Eighth, and Fourteenth Amendment rights. 

 In determining the answer to the special issues, the jury may consider all evidence presented at
trial, including at the guilt-innocence phase. (28) In reviewing the legal sufficiency of the jury's answers, we
consider all evidence in the light most favorable to its findings, and then determine whether, based on
that evidence and reasonable inferences therefrom, a rational jury could have found beyond a
reasonable doubt that the answer to Special Issue No. 1 was "yes." (29)

 At the punishment phase, the State began by offering the appellant's pen packets. They showed
that the appellant had been convicted previously of burglary of a habitation, for which he was sentenced
to ten years in prison (upon revocation of his probation). They also showed a prior conviction for felony
theft, for which the appellant received a seven-year sentence, as well as a five-year term for another
theft conviction. In total, the appellant had been arrested at least seventeen times before murdering
Nikki.

 The State then called Della Gray, the appellant's ex-wife and the mother of his two older
children. Gray testified that the appellant was physically abusive towards her both before and after they
got married, including incidents where he strangled her with a coat hanger, punched her in the face and
broke her nose while she was pregnant, and beat her with a fireplace shovel. She also told of a time
when she had gone out to help a friend, leaving the appellant and their son, Robert, Jr., at home alone
together. When she returned, Robert, Jr. had a bruised face, and when she asked him what happened,
Robert, Jr. told her he had fallen off the bed. She also described an incident in which the appellant was
alone in a bedroom with their then two-year-old daughter Victoria for thirty minutes. Victoria was
screaming and upset, and when the appellant finally let her out of the room she had a "hickey" on her
neck. Overall, Gray described herself as scared of the appellant, such that she never reported any of
the suspected abuse to the authorities. She said she currently was not allowed to spend any time with
her children. On cross-examination, Gray admitted she had been involved in a lengthy custody battle
against the appellant and his mother, which she ultimately lost, some eleven years previously. She also
admitted to some history of alcohol and drug abuse, and that she had not provided, nor has she been
asked to provide, any support for her children in the years since she lost custody of them.

 There was testimony from another witness concerning a dispute with a neighbor that escalated
into a physical altercation with a teenage boy. The State then rested its punishment case-in-chief.

 The appellant called two officers from the Anderson County jail to testify that the appellant had
no history of violence or disciplinary problems while incarcerated there. The appellant then called Dr.
John Krusz. Dr. Krusz's testimony consisted of that which was offered and excluded at the guilt-innocence phase, namely, a discussion of what he referred to as the appellant's "post-concussional type
syndrome." (30) Dr. Krusz said that his evaluation of the appellant led him to conclude that, despite his
poor ability to deal with stressful situations in the past, the appellant would be able to control his
behavior in the controlled, structured environment of prison.

 On cross-examination, Dr. Krusz acknowledged that the major portion of his work was in the
treatment of chronic pain and migraine headaches. He also admitted that the appellant had not informed
him of his history of abuse towards his ex-wife and children. He also acknowledged that, even if the
appellant was brain damaged, there are many people in the world who are brain damaged and have not
murdered a child. Dr. Krusz also conceded that the appellant's brain disorder might be attributable to
the appellant's long-term history of drug abuse, including intravenous drugs.

 The appellant then called Kelly R. Goodness, Ph.D. Dr. Goodness was a forensic psychologist
who had interviewed the appellant while he was incarcerated during this trial, as well as other people
who knew the appellant, including his family. Dr. Goodness testified that, in her opinion, the appellant
had been physically abused as a child by his father, despite denials of abuse by the appellant and his
family. She also said she believed that the appellant's two older children had been abused, but that she
could find no conclusive evidence to say whether the abuse came from the appellant or his ex-wife. She
said she believed the appellant suffered from brain damage -- specifically, that his brain was "compromised" -- as well as depression, substance dependence, and antisocial-personality disorder. She also
testified that the appellant's mother had a very dominant influence on him and that, if not for her
influence, he likely would not have sought custody of Nikki. In her opinion, the appellant was unlikely to
attempt to escape from prison, nor was he likely to pose a future danger while in prison. After Dr.
Goodness's testimony, the appellant rested his punishment case-in-chief.

 In rebuttal, the State called Thomas Allen, Ph.D., a psychologist who interviewed the appellant
and reviewed his records. Dr. Allen testified that, based on the severity of the crime in this case, the
appellant's family history, his history of substance abuse, and other factors, he believed that the
appellant was a psychopath and that it was probable he would commit future acts of violence, even in
prison.

 The State then called David Self, M.D., a psychiatrist who interviewed the appellant along with
Dr. Allen. Dr. Self disputed Dr. Krusz's diagnosis of post-concussion syndrome. He agreed that the
appellant has poor impulse control, but that led him to conclude that the appellant would be at risk to
engage in future acts of criminal violence because he would be targeted by other inmates in prison as
someone who had hurt a child, and he likely would have to defend himself from physical attacks. On
cross-examination, Dr. Allen acknowledged that many people in the appellant's condition do not act
out violently in prison, and that the appellant himself had no history of violent incidents during his prior
years of incarceration.

 The appellant contends that the evidence above was insufficient to support the jury's finding on
future dangerousness because he had no prior convictions of violent crimes and because the State over-emphasized the nature and importance of the scuffle between the appellant and his neighbor. We note
that the crime itself -- killing a two-year-old child by beating or shaking her -- was particularly violent.
We also note that the appellant had a lengthy criminal record, even in the absence of a violent-crime
conviction. Both sides presented expert testimony as to the appellant's future dangerousness, but we do
not find the appellant's expert testimony to be significantly more compelling than that which was
presented by the State. In short, viewed in the light most favorable to the verdict, we find a rational jury
could have answered "yes" to Special Issue No. 1, the issue of future dangerousness. The evidence
was therefore sufficient to support the jury's answer beyond a reasonable doubt. We overrule point of
error thirteen. 

Facial Challenges

 In his first four points of error, the appellant argues that Section 19.03(a)(8) of the Texas Penal
Code is unconstitutional on its face because the Legislature's decision to make capital punishment
available for any murder in which the victim is under six years of age is arbitrary and not substantially
related to the achievement of an important governmental objective. In his first and third points of error,
he argues this violates the Texas Constitution, (31) while in his second and fourth points of error, he asserts
violations of the United States Constitution. (32) Essentially, the appellant asserts an equal-protection
violation because the statute discriminates on the basis of age -- or rather it discriminates against
defendants like himself, based on the ages of their victims. Although he acknowledges that age
discrimination normally would not be subject to strict-scrutiny review, the appellant argues that at least
"heightened" review is appropriate in the case of this statute, which has implications of life and death.

 We addressed this exact issue in Henderson v. State. (33) There, we considered and rejected the
appellant's equal-protection argument that a stricter level of scrutiny was warranted because life-and-death issues were implicated by the statute in question. (34) We then concluded that Section 19.03(a)(8) is
constitutional under a rational-basis standard. (35) Additionally, we held that Section 19.03(a)(8) does not
violate the Eighth Amendment's prohibition of cruel and unusual punishments. The appellant here
presents no new arguments to merit reconsideration of our decision in Henderson. (36) Points of error one
through four are overruled.

 In his eighth point of error, the appellant asserts that the capital-murder statute under which he
was convicted is in pari materia to the Penal Code provisions concerning injury to a child. (37) Therefore, he argues, his conviction should be vacated and a verdict should be rendered for the offense of
injury to a child.

 In pari materia is a principle of statutory interpretation, a means of interpreting and giving full
effect to legislative intent. (38) When two statutes are in pari materia, we construe them together as if
they were one and the same law. (39) Any conflict between their provisions will be harmonized, if possible,
and effect will be given to all the provisions of each act if they can be made to stand together and have
concurrent efficacy. (40) However, if two statutes do not deal with the same subject matter, persons, or
purpose, they are not in pari materia and should be construed separately and in accordance with the
plain wording of the particular statute. (41)

 Injury to a child and capital murder are obviously two different offenses. More to the point, they
are two different legislative acts, with different elements of proof, different penalties, and are obviously
designed to serve different purposes. (42) It is contrary to a plain reading of the statutes to suggest that the
legislature, in specifically acting to make murder of a child under the age of six a capital offense,
intended for that act to be superseded by the enactment of the lesser offense of injury to a child. The
two statutes are not in pari materia. Point of error eight is overruled.

 In his ninth point of error, the appellant claims the jury instructions called for under the Texas
capital-murder statute (43) violate his rights under the Eighth and Fourteenth Amendments because they
permit the imposition of the death penalty without a finding of enhanced culpability. In his tenth point of
error, he argues that the lack of a "deliberateness" requirement in the capital-murder statute makes it
unconstitutional under the Eighth and Fourteenth Amendments. Article 37.071 has repeatedly been held
not to violate the Eighth Amendment. (44) We overrule points of error nine and ten.

Conclusion

 We affirm the trial court's judgment.


Delivered June 20, 2007.

Do not publish.
1. See Penal Code §19.03(a)(8).
2. See Code Crim. Proc. art. 37.071, § 2(b), (e), (g).
3. Id. § 2(h).
4. 443 U.S. 307 (1979).
5. Id. at 319; Simmons v. State, 109 S.W.3d 469, 472 (Tex. Cr. App. 2003).
6. Appellant's brief at 37.
7. Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Cr. App. 1991).
8. Turner v. State, 600 S.W.2d 927, 929 (Tex. Cr. App. 1980); Allen v. State, 478 S.W.2d 946, 947 (Tex. Cr. App.
1972).
9. Vodochodsky v. State, 158 S.W.3d 502, 510 (Tex. Cr. App. 2005) (citations and quotation marks omitted).
10. See Penal Code § 19.03(a)(8).
11. See Penal Code § 19.03(a)(2).
12. Specifically, the autopsy report concluded, "The external genitalia, anus, and perineum are unremarkable."
Clerk's Record, at 301; Analysis of an anal swab and anal smear taken from the victim's body detected neither
seminal fluid nor spermatozoa. Id. at 307.
13. Graham v. State, 19 S.W.3d 851, 853 (Tex. Cr. App. 2000); Hathorn v. State, 848 S.W.2d 101, 113 (Tex. Cr.
App. 1992).
14. Ibid.
15. 160 S.W.3d 568 (Tex. Cr. App. 2005).
16. Id., at 573.
17. R. Evid. 403.
18. Jackson, 160 S.W.3d, at 574.
19. 126 S. Ct. 2709 (2006).
20. Id. at 2737.
21. Id. at 2724-25.
22. Id. at 2735.
23. Id. at 2736.
24. See Code Crim. Proc. art. 37.071, § 2(b)(1).
25. Abdnor v. State, 871 S.W.2d 726, 731-32 (Tex. Cr. App. 1994).
26. Rayford v. State, 125 S.W.3d 521, 534 (Tex. Cr. App. 2003). 
27. Collier v. State, 959 S.W.2d 621, 623 (Tex. Cr. App. 1997) (quoting Morris v. State, 940 S.W.2d 610, 613
(Tex. Cr. App. 1996)).
28. Code Crim. Proc. art. 37.071§ 2(d)(1).
29. Lad v. State, 3 S.W.3d 547, 558 (Tex. Cr. App. 1999) (quoting Harris v. State, 738 S.W.2d 207, 225-26 (Tex.
Cr. App. 1986)).
30. See point of error eleven, ante.
31. Tex. Const. art 1, §§ 3, 13.
32. U.S. Const. amends. V, VI, VIII, & XIV.
33. 962 S.W.2d 544 (Tex. Cr. App. 1997).
34. Id. at 560-61.
35. Id. at 563.
36. See also, Ripkowski v. State, 61 S.W.3d 378 (Tex. Cr. App. 2001).
37. See Penal Code §22.04(a), (b).
38. Mills v. State, 722 S.W.2d 411, 413 (Tex. Cr. App. 1986).
39. Ibid.
40. Ibid (quoting Ex parte Harrell, 542 S.W.2d 169, 171 (Tex. Cr. App. 1976)).
41. Cheney v. State, 755 S.W.2d 123, 127 (Tex. Cr. App. 1988).
42. Id,. at 130.
43. Code Crim. Proc. art. 37.071.
44. See generally Jurek v. Texas, 428 U.S. 262 (1976); Threadgill v. State, 146 S.W.3d 654, 672-73 (Tex. Cr.
App. 2004); Garcia v. State, 126 S.W.3d 921, 929 (Tex. Cr. App. 2004); Reyes v. State, 84 S.W.3d 633, 637 (Tex. Cr.
App. 2002).