In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00169-CR


______________________________




RICHARD LEONAR WHYTUS, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 196th Judicial District Court


 Hunt County, Texas


Trial Court No. 23,584




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION



 Richard Leonar Whytus appeals from his conviction by a jury on seven charges of aggravated
assault with a deadly weapon. (1) See Tex. Penal Code Ann. § 22.20(a)(2) (Vernon Supp. 2008). The
evidence shows that, while quite intoxicated, he drove his car into a daycare full of napping children. 
Two workers and several of the children were injured. 

 Whytus has filed a single brief, in which he raises a single issue which is common to all of
his appeals. He argues that the trial court committed reversible error by refusing to submit his
requested charge on the lesser-included offense of assault causing bodily injury.

 We addressed this issue in detail in our opinion of this date on Whytus' appeal in cause
number 06-08-00167-CR. For the reasons stated therein, we likewise conclude that error has not
been shown in this case.

 We affirm the judgment. 


 Josh R. Morriss, III

 Chief Justice


Date Submitted: February 26, 2009

Date Decided: February 27, 2009


Do Not Publish
1. Whytus appeals from seven convictions, all for aggravated assault with a deadly weapon,
cause numbers 06-08-00167-CR through 06-08-00173-CR. 



mpted suicide at least once.

 After their divorce, Ransdell and Bonnie maintained an amicable relationship. Ransdell
(although maintaining a dwelling elsewhere) apparently had the run of Bonnie's house--both day
and night--and he and Bonnie still sometimes engaged in sex together. 


 Ransdell had, a few days before, driven off with Bonnie's car, which contained her purse,
cellular telephone, house keys, and other items. Then, in the early morning hours of November 4,
2005, Ransdell appeared at the house, telling Bonnie that he wanted to take a shower there. Bonnie
consented and was pleased to have her car and other items returned to her. 

 After he had showered, Ransdell became convinced that "people" who had malicious
intentions toward Bonnie and the couple's children were both inside and outside of the house. 
Ransdell maintained that he could see the nonexistent "people" and insisted that all of the lights be
turned off so these "people" could not see any of the Ransdell family. Ransdell used a light on
Bonnie's cellular telephone to negotiate around through the house; he even peered through the hatch
going into the attic of the house and announced that some of the "people" were in the attic as well. 
During this episode, he became extremely agitated; he shoved the entertainment center against the
front door to block its entrance to the "people" (though it is unclear whether he was attempting to
keep the "people" inside the house or outside of it), began carrying around a child's aluminum
baseball bat, and yelling enough to be foaming about the mouth. 

 The Bonham Police Department received two 9-1-1 emergency calls. One of these was from
Bonnie's next-door neighbor, who complained of having been awakened by the screaming of
Ransdell, Bonnie, and the children. The other emergency call was from Ransdell, who called to seek
police assistance in protecting against the unnamed "people" he was seeing as being a threat to his
family.

 When the first officer arrived, Sierra spotted his police flashlight and pounded on a picture
window in the front of the house, crying and screaming, "help me." The officer observed Bonnie,
with Zach in her arms, both mother and child weeping; Ransdell was in the same room, shouting, 
screaming, and "wild-eyed." Another officer arrived and the officers were told by Bonnie through
the window that the front door was barricaded, the officers proceeded to the rear door of the house. 
Sierra came running from the house with her arms extended toward one of the officers, crying and
saying, "Help me, my dad's crazy." Sierra was followed by Jayden, Bonnie, and Zach. Ransdell then
exited the rear door of the house; after he first paced back and forth, shouting that there were people
in the house. On the demands of the officers, he laid on the ground and allowed himself to be
handcuffed and escorted to jail.

 Initially, Bonnie wrote a statement for the police which said that Ransdell had blocked the
front door of the house with the entertainment center and that, when they had attempted to exit
through the rear door of the house, Ransdell had blocked them. Thereafter, Bonnie signed more than
one document requesting that no prosecution of the claim proceed, maintaining that all that she
wanted concerning Ransdell was aid in getting him treatment, not in criminal prosecution of him. 
At trial, Bonnie recanted the portion of her statement that he had barred their exit, maintaining that
Ransdell had been blocking the use of the exits to protect his family from "the people" and did not
attempt to bar any members of the family from leaving the house except in his attempt to protect
them.

 Under Section 20.02 of the Texas Penal Code, the base offense of unlawful restraint (2) is to
intentionally or knowingly restrain another person. Without additional circumstances, this is a class
A misdemeanor. Tex. Penal Code Ann. § 20.02 (Vernon 2003). However, if the restrained person
is younger than seventeen years of age, the crime escalates to a state-jail felony and it becomes a
felony of the third degree if the "actor recklessly exposes the victim to a substantial risk of serious
bodily injury." Id.

FACTUAL/LEGAL INSUFFICIENCY CLAIMS

 Ransdell raises three points of error, all relating to the legal and/or factual sufficiency of the
evidence to support the finding of guilt. (3) 

 In a factual sufficiency review, the evidence is reviewed in a neutral light rather than (as in
a legal sufficiency review) in the light most favorable to the verdict. Roberts v. State, No. AP-75,051, 2007 Tex. Crim. App. LEXIS 429 (Tex. Crim. App. Apr. 18, 2007). Evidence can be
factually insufficient in one of two ways: (1) when the evidence supporting the verdict is so weak
that the verdict seems clearly wrong and manifestly unjust, and (2) when the supporting evidence
is outweighed by the great weight and preponderance of the contrary evidence so as to render the
verdict clearly wrong and manifestly unjust. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim.
App. 2006). A reversal for factual insufficiency cannot occur when "the greater weight and
preponderance of the evidence actually favors conviction!" Id. at 417. Although an appellate court
reviewing factual sufficiency has the ability to second-guess the jury to a limited degree, the review
should still be deferential, with a high level of skepticism about the jury's verdict required before a
reversal can occur. Cain v. State, 958 S.W.2d 404, 407 & 410 (Tex. Crim. App. 1997).

 We apply well-known standards when reviewing challenges to the legal sufficiency of the
evidence. See Jackson v. Virginia, 443 U.S. 307, 319 (1979). Viewing the evidence in the light
most favorable to the verdict, we determine whether any rational trier of fact could have found the
elements of the offense beyond a reasonable doubt. Vodochodsky v. State, 158 S.W.3d 502, 509
(Tex. Crim. App. 2005); Escamilla v. State, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004), cert. 
denied, 544 U.S. 950 (2005); Simmons v. State, 109 S.W.3d 469, 472 (Tex. Crim. App. 2003).

 Under either a review of the factual or legal sufficiency of the evidence, the jury is the
exclusive judge of the witnesses' credibility and the weight to be given to their testimony and is free
to accept or reject any or all of the evidence presented and to make reasonable inferences and
deductions from the evidence. See Swearingen v. State, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003);
Jones v. State, 944 S.W.2d 642, 647-48 (Tex. Crim. App. 1996); Smith v. State, 895 S.W.2d 449,
452 (Tex. App.--Dallas 1995, pet. ref'd).

EVIDENCE OF ILLEGAL RESTRAINT

 Looking at the evidence, a good portion of the facts have already been set out above and there
is no need to restate them. However, as to the critical issue of the restraint of Sierra, we find some
contradictions from the primary witness to the incident, Bonnie. On direct examination at trial, some
of the testimony from Bonnie went as follows:

 Q. Did Sierra ever try to leave?

 

 A. I don't think she ever tried to leave. None of the kids were trying --
I mean, it was early in the morning. It wasn't like it was daylight and they wanted to
go outside and play. You know, they didn't try to get out the doors. The baby
wouldn't have tried to get out the door, that sort of thing.

 

 Q. Well, did James ever grab her, hold her, or put her in her room or --

 

 A. Huh-uh.

 

 Q. -- or use a verbal command to restrain her from going outside or
leaving the house?

 

 A. No.


 Bonnie also testified that Ransdell had used the entertainment center to barricade the front
door. She related that Ransdell's ranting about the "people" frightened the children, who began to
cry. From the rendition which was given by her at trial, the fears of the children--when coupled
with the irrational thought patterns of Ransdell--made the entire episode spiral upward into a truly
out-of-control situation. 

 This was the general tenor of the testimony from Bonnie regarding Ransdell's conduct
regarding the restraint of Sierra during the incident.

 However, this testimony contrasted with the written statement given by Bonnie on the
morning of November 4, 2005. In it, she related that: 

 I felt that Jay was not letting us leave the house. He was saying that he was keeping
"people in." If we went to the Back door he would go & jump on the Bar Preventing
us from going out the Rear door. He moved the entertainment center in front of the
Front door. We had no way out.


 While these two statements are not entirely inconsistent, (4) the statement given by Bonnie to
the police in the early morning after the incident does not attribute the benignity to Ransdell's
conduct which her testimony gives at trial. The general tenor which the jury could glean from the
two was that Sierra (and the others in Ransdell's family) were being restrained by Ransdell in the
house against their will. The fact that Sierra, a ten-year-old at the time, made no actual attempt to
power past her raving father in an attempt to leave the house did not diminish the fact that he was
preventing her from leaving. Section 20.01 of the Texas Penal Code provides that:

 "Restrain" means to restrict a person's movements without consent, so as to interfere
substantially with the person's liberty, by moving the person from one place to
another or by confining the person. Restraint is "without consent" if it is
accomplished by:


 (A) force, intimidation, or deception; or

 

 (B) any means, including acquiescence of the victim, if:


 (i) the victim is a child who is less than 14 years of age or an
incompetent person and the parent, guardian, or person or institution acting
in loco parentis has not acquiesced in the movement or confinement.


Tex. Penal Code Ann. § 20.01.


 There is nothing which would require the victim of an illegal restraint to attempt to escape;
the threat of force (whether real or reasonably perceived) would be sufficient to restrain her. There
was sufficient evidence, both legally and factually, for the jury to have found that Ransdell
unlawfully restrained Sierra, a child younger than fourteen years of age.

EXHIBITION OF DEADLY WEAPON IN THE COMMISSION OF AN OFFENSE

 The State concentrated a great deal on the fact that Ransdell was, at one time during the
episode, carrying around an aluminum baseball bat which his elder son (then age six) used when
playing T-ball. They elicited testimony that the boy had gotten in trouble because he had put a dent
in the family's lawnmower by hitting it with the bat; accordingly, it was substantial enough that it
could have been used as a deadly weapon.

 As mentioned before, whether or not the T-ball bat carried by Ransdell during the incident
constituted the use of a deadly weapon becomes important because Section 12.35 of the Texas Penal
Code provides that an individual adjudged guilty of a state-jail felony shall be punished for a
third-degree felony if it is shown on the trial of the offense that a deadly weapon was used or
exhibited during the commission of the offense. Tex. Penal Code Ann. § 12.35 (Vernon 2003). 
Section 1.07(17) of the Texas Penal Code defines a "deadly weapon" as being "(A) a firearm or
anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily
injury; or (B) anything that in the manner of its use or intended use is capable of causing death or
serious bodily injury." Tex. Penal Code Ann. § 1.07(17) (Vernon Supp. 2006). Certainly, a child's
T-ball baseball bat does not fit within the category (A) above because it was not designed, made, or
adapted as set out in the statute. However, it is possible that it "in the manner of its use or intended
use" would be capable of inflicting death or serious bodily injury. Not even a knife is necessarily
a deadly weapon per se. Brown v. State, 716 S.W.2d 939, 946 (Tex. Crim. App. 1986). There are
certain factors which a jury may consider when analyzing whether an object is a deadly weapon: 
(1) the physical proximity between the alleged victim and the object; (2) any threats or words used
by the accused; (3) the size and shape of the object; (4) the potential of the object to inflict death or
serious injury; and (5) the manner in which the accused allegedly used the object. Id. at 946-47;
Williams v. State, 575 S.W.2d 30, 32-33 (Tex. Crim. App. [Panel Op.] 1979); see also Adame v.
State, 69 S.W.3d 581, 584 (Tex. Crim. App. 2002) (Meyers, J., concurring); Nunez v. State, 117
S.W.3d 309, 323 (Tex. App.--Corpus Christi 2003, no pet.); In re S.B., 117 S.W.3d 443, 446-47
(Tex. App.--Fort Worth 2003, no pet.). No one factor is determinative, and each case must be
examined on its own facts. Adame, 69 S.W.3d at 584; Brown, 716 S.W.2d at 946-47; Nunez, 117
S.W.3d at 323. 

 All of the testimony shows that Ransdell had been carrying the bat about as a weapon--but
not as a weapon to be used against Sierra or any other member of his family. Rather, all of the
evidence reveals that Ransdell intended this bat to aid him in protecting them against the totally
nonexistent "people" he believed posed a threat to them. He did not wave it about or thrash the air
with it; he did not threaten them with it. (5) It was plainly proven that Ransdell and the bat were in
close physical proximity to Sierra, that the bat was of a physical size and shape to inflict harm, and
that (should he have intended its use in that fashion) there was the potential of using the T-ball bat
to inflict death or serious injury. Many objects of a usually apparently-mundane character could fit
those characteristics. (6) However, there is no evidence to support any claim that he threatened to use
the bat on Sierra, that Sierra was afraid that he would use it on her, or that Ransdell used it in any
fashion to restrain her movements from the house. The only entities upon whom Ransdell intended
to use the bat, if necessary, were the "people" whom he believed were threatening his family--and
the "people" did not exist. This is not to say that, considering Ransdell's apparent propensity toward
wild irrationality, that the bat could hypothetically be used as a deadly weapon; for instance, in some
other circumstance, he could irrationally decide that a danger arose from his family and not the
chimera he perceived that night was dangerous. But the fact remains that on that night, his intended
use of the bat was to protect his family and not to place them in danger. The danger or threat posed
must be real and not simply hypothetical. To sustain a deadly weapon finding, there must be
evidence that others were actually endangered, not merely there was a hypothetical potential for
danger. Cates v. State, 102 S.W.3d 735, 738 (Tex. Crim. App. 2003). "While a deadly weapon
finding does not require that the object actually cause death or serious bodily injury, it does require
that the object have more than a hypothetical capability of causing death or serious bodily injury."
Johnston v. State, 115 S.W.3d 761, 764 (Tex. App.--Austin 2003), aff'd, 145 S.W.3d 215 (Tex.
Crim. App. 2004).

 We find that the evidence is legally insufficient to support the charge that Ransdell used or
exhibited a deadly weapon during the commission of the offense. This point of error is granted.

SUBSTANTIAL RISK OF SERIOUS BODILY INJURY 

 It is quite obvious that Ransdell suffers from extreme mental illnesses. His conduct on
November 4, 2005, was clearly erratic, wild, crazy, and hellish to those who had to witness it. One
can speculate upon what dire things might have occurred on that early morning if Ransdell's
delusions had taken a slightly different twist than they did that night. However, it is not the province
of the jury to have speculated on what might have occurred but, rather, what actually did occur.

 As the testimony and evidence set out above show, during the entire episode, the source of
Ransdell's anxiety was the perceived danger which the "people" posed to his family. He barricaded
the door, ranted and raved, armed himself with a small bat, and finally placed a 9-1-1 emergency call
himself in order to protect his family and to extricate them from what he apparently believed to be
some perceived but imaginary threat to them. No doubt, his rantings about the invisible "people"
and his overall conduct terrified the small children; it is impossible to gauge the adverse
psychological impact which this kind of conduct has upon small children who are placed in a
position of watching their father exhibiting this type of conduct. It is important to note that any
damage done to the children in this incident would be to their psyches and not to their persons.

 However, there was never any evidence presented that he threatened his family (including
Sierra), physically abused them in any fashion, (7) or placed them in physical danger. "Serious bodily
injury" is defined by Section 1.07(46) of the Texas Penal Code as being "bodily injury that creates
a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss
or impairment of the function of any bodily member or organ." Tex. Penal Code Ann. § 1.07(46)
(Vernon Supp. 2006). Damage to the child's mental well-being does not fall within that definition. 
The evidence is not legally sufficient to show that he placed Sierra at a substantial risk of serious
bodily injury.

 The jury charge included the lesser-included offense of the state-jail felony of the illegal
restraint of a child less than seventeen years of age. We find this to have been the appropriate
finding and sentence. A court of appeals may reform a judgment of conviction to reflect conviction
of a lesser-included offense only if (1) the court finds that the evidence is insufficient to support
conviction of the charged offense, but sufficient to support conviction of the lesser-included offense,
and (2) either the jury was instructed on the lesser-included offense (at the request of a party or by
the trial court sua sponte) or one of the parties asked for but was denied such an instruction. Collier
v. State, 999 S.W.2d 779 (Tex. Crim App. 1999).

 Because there was legally insufficient evidence to support the jury's deadly weapon finding,
we sustain Ransdell's point regarding that issue. Accordingly, the trial court's judgment is modified
to delete the affirmative finding that a deadly weapon was used during the commission of the offense
and to delete the finding that Ransdell exposed Sierra to a substantial risk of serious bodily injury. 
See Williams v. State, 970 S.W.2d 566 (Tex. Crim. App. 1998) (remedy when affirmative finding
erroneously made). As reformed and modified, Ransdell's conviction of the state-jail offense of
unlawful detention of a child less than seventeen years of age is affirmed, the punishment is reversed,
and we remand the case to the trial court for a determination of the punishment for that offense. 



 Bailey C. Moseley

 Justice


Date Submitted: April 19, 2007

Date Decided: May 8, 2007


Do Not Publish


1. The jury also found that, in doing this act, Ransdell exhibited a deadly weapon which,
pursuant to Section 12.35(c)(1) of the Texas Penal Code, converts a state-jail felony to a third-degree
felony. See Tex. Penal Code Ann. § 12.35(c)(1) (Vernon 2003).
2. Under Section 20.01 of the Texas Penal Code, the word "restrain" includes the restriction
of a person's movements without consent. Restraint of a child less than fourteen years old can be
accomplished by any means (including the acquiescence of the victim) if the parent, guardian, or
person or institution acting in loco parentis has not acquiesced in the confinement. Tex. Penal
Code Ann. § 20.01 (Vernon Supp. 2006).
3. At trial, Ransdell's attorney had requested (but had been denied) a jury instruction that would
have raised the affirmative defense set out in Section 20.02(b) of the Texas Penal Code. See Tex.
Penal Code Ann. § 20.02(b). However, no point of error was raised concerning the denial of this
request and we do not consider it. 
4. In one statement, she says that he was not allowing them to leave the house; in the other, she
was saying that they nevertheless never attempted to leave.
5. The following exchange between the State and Bonnie is illustrative:


 Q. And he was roaming through the house at 3:00 in the morning with
the bat?


 A. Well, as I stated several times before, and we went through this before
about what I'm saying, when he got the bat it was all of about walking down the hall
to the living room and me telling him put the bat up, and him walking back down the
hallway. He was not roaming through the house. He was not screaming. He was not
yelling. He was not waving the bat. He was not threatening us with the bat.


 Q. Was he agitated when he had the bat?


 A. Not at me. Not at the children.
6. Andrea Yates drowned her five children in a bathtub of water. See Yates v. State, 171
S.W.3d 215 (Tex. App.--Houston [1st Dist.] 2005, pet. ref'd).
7. At one point in time, Ransdell was holding Zach, the four-year-old in his arms. The child
leaned over to go to the arms of his mother. Ransdell believed the child to be falling and grabbed
him tightly, causing Zach to cry and complain that Ransdell had hurt his leg.